IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| DR. RAYMOND PFANG | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| LAMAR INSTITUTE OF TECHNOLOGY | § | |
| *Defendant*. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Dr. Raymond Pfang files this Original Complaint complaining of Defendant Lamar Institute of Technology and in support thereof would show the court as follows:

### I.    JURISDICTION AND VENUE

1.1    This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, 1343, and 1367. This case is brought under the Fourteenth amendments to the Constitution of the United States. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b), as all or a substantial part of the events giving rise to Plaintiff's claims arose in this district.

1.2    All of the conduct, by Defendant, alleged herein was done by policymakers of the Defendant and under its policies and procedures. Such actions were done under the color of law.

### II.    PARTIES

2.1    Plaintiff is of Chinese descent and a naturalized citizen of the United States. At all relevant times Plaintiff resided in Beaumont, Jefferson County, Texas.

2.2    Defendant Lamar Institute of Technology ("LIT") is a two-year component institution of Texas State University System ("TSUS"). LIT is located in Beaumont, Texas and organized and existing pursuant to the laws of the state of Texas. The address of LIT's

administrative office is 855 E. Lavaca, Beaumont, Jefferson County, Texas. LIT may be served with process by serving its President, Sidney E. Valentine, Ph.D., at the foregoing address.

### III.    FACTUAL BACKGROUND

**Plaintiff Is Employed by Lamar Institute of Technology**

3.1    As noted above, Dr. Pfang is of Chinese descent and a nationalized citizen of the United States. Dr. Pfang's education includes an MBA from the University of Greenwich, London, England and a Ph.D. in Management, University of Surrey Business School, Guildford, England. Prior to his employment with LIT, his employment from 2013 to 2021 included administrative positions (i.e., Dean, Assistant Dean, Assistant to the President) with Tarrant County College, Fort Worth, Texas, and Palo Alto College, San Antonio, Texas.[1]

3.2    Plaintiff submitted his application for the position of Associate Vice President of Education Support at LIT on October 29, 2021. The then President of LIT,  Dr. Lonnie Howard ("Howard" or the "President") emailed Plaintiff the next day telling Plaintiff that he was impressed with his cover letter and *curriculum vitae*. On November 2, 2021, Howard flew to San Antonio to interview Plaintiff and offered him not only the position that he had applied for but an additional position of Special Assistant to the President. Accepting the offered positions would also mean the Plaintiff would be a member of President Howard's "executive team" working with Howard and the other LIT Administrators.

3.3    In the interview, Howard told Plaintiff that he would mentor Plaintiff to a presidency of a college or university saying that he (Howard) had successfully mentored three others to presidencies. Howard gave Plaintiff a written offer on November 15, 2021, which

---

[1] Prior to immigrating to the United States in 2011, Dr. Pfang was Director of Operations for Infocheck Ltd, UK, founding CEO of NES Healthcare, UK, and later Program Director for the MA in Global Management, Senior Lecturer & Director, Regents Business Forum, at Regent's University Business School, London.

Plaintiff accepted. Plaintiff began his employment with LIT on December 1, 2021. As will be explained below, Plaintiff was terminated from employment with LIT by Provost Angela Hill on April 21, 2022.

**President Howard Gives Plaintiff Additional Responsibilities**

3.4    Within a few days after Plaintiff began his employment with LIT as Associate Vice President of Educational Support and Special Assistant to the President, another Associate Vice President ("AVP") unexpectedly resigned from her position as AVP for Workforce and Strategic Initiatives. Howard asked Plaintiff to oversee the duties of the former AVP on a temporary basis until a replacement was hired.

3.5    Plaintiff led the search and developed a short list of candidates for the open AVP position. However, rather than hire an AVP to fill the open position, Howard terminated the search deciding not to fill the position. Instead, Howard asked Plaintiff to take over the position and Plaintiff complied. Including his newly added position, Plaintiff oversaw several departments including Marketing, Institutional Effectiveness, Assessment and Research, Grants, New Program Development, the LIT Foundation, professional truck driver training and the staff associated with these departments. Plaintiff received no additional pay for assuming the new duties and despite Plaintiff's request for additional help, he was given none.

3.6    Also, shortly after Plaintiff began his employment, the President asked him to reorganize the administrative structure of the campus from top to bottom. Over a period of weeks, after talking with other Executive Team members and certain LIT staff, Plaintiff provided the President with his proposal, including written explanations of the reasons for new realignments.

**The President Undermines Plaintiff's Authority**

3.7     Near the end of Plaintiff's LIT's reorganization project, Dr. Byron Prince ("Prince"), one of Plaintiff's direct reports as AVP of the Workforce Department, told Plaintiff that the President, had asked him (Prince) to prepare a proposed reorganization chart of the Workforce Department showing himself as the AVP of the Department. Plaintiff was surprised to learn that the President had asked this of Prince since Plaintiff was the current AVP of the Department and the President knew that under Plaintiff's reorganization proposal, Plaintiff would remain as such. Ultimately, Plaintiff did remain AVP of the Workforce Department and continued as Prince's supervisor.

3.8     Plaintiff would come to understand this was only the first instance where Plaintiff's respect and authority in his position as Prince's supervisor would be undermined by President Howard. The President and Prince are African American.

3.9     On or about February 15, 2022, Howard named Dr. Angela Hill ("Hill") as LIT's Vice President of Instruction and Provost. Hill is African American. Hill had far less experience to serve in these positions than did Plaintiff. After Hill's appointment, the President informed Plaintiff that he would now report directly to Hill. All other members of the President's executive team also began reporting directly to Hill, except Gonzales who was the VP/CFO.

3.10    In addition to Hill and Plaintiff, other members of the President's executive team were Rudy Gonzales ("Gonzales"), Vice-President of Finance and Operations; Veronica Garcia ("Garcia"), Associate Vice-President; Ken Mason; and Andrea Stephenson. Both Gonzales and Garcia are Hispanic. Mason and Stephenson are Caucasian American (Anglo).

**The President Gives Plaintiff a Confusing Message**

3.11    The day after Hill's appointment was announced, the President conducted an Executive Team meeting. During the meeting, in front of the other Executive Team members, the President mentioned to Plaintiff and Garcia that if being at LIT did not fit into their career plans, he would be willing to make a call, presumably to help them get other jobs and, as a good will gesture, would waive the obligation for them to repay their relocation allowances. Plaintiff had no idea why the President would make this comment/offer particularly in an Executive Team meeting. The next morning Plaintiff emailed the President thanking for his offer and thereafter, the President called and assured Plaintiff that he did not want him to leave his employment with LIT.

**Plaintiff Learns in an LIT Meeting That the President Is Removing One of Plaintiff's Job Assignments**

3.12    On or about February 15, 2022, the President, speaking to a convocation town-hall meeting of LIT's campus faculty and staff and, without prior consultation with Plaintiff, announced that the position of Special Assistant to the President was vacant and was open for anyone who was interested in applying. This was one of the two original positions for which Plaintiff was hired by the President and for which Plaintiff received an $8,000 stipend. Plaintiff was shocked and surprised to learn in a public forum that the President was removing him from this position.

3.13    After the President's public announcement, Plaintiff emailed him and told him that since he was no longer the Special Assistant to the President, he should not continue to receive the stipend for the position. Plaintiff also spoke with Gonzales, the CFO, about surrendering the stipend. Gonzales told Plaintiff that the President said it was not necessary for him to do so. Notably, thereafter the President did not fill the position and continued to  refer  to Plaintiff as the Special Assistant to the President up to the time of Plaintiff's firing.

**Plaintiff's Meetings to Discuss Possible Aviation Maintenance Program**

3.14     Consistent with his duties as AVP of Workforce and Strategic Initiatives, Plaintiff on December 27, 2021, emailed the President with a list of possible classes and programs that would be of benefit to LIT. Two of the recommended possibilities were an aviation maintenance program and a private pilot's associates degree. Thereafter, Plaintiff emailed the City of Beaumont regional airport manager proposing a meeting to discuss the possible development of these programs.[2]

3.15     Plaintiff copied Hill, his now direct supervisor on the email to keep her advised of his plan to meet regarding the development of these programs. Plaintiff received no comment from Hill and scheduled the meeting for March 10, 2022, at Beaumont regional airport. Plaintiff attended the meeting for LIT along with Tiffany Williams-Parker ("Williams-Parker") Williams-Parker is African American.

3.16     On March 14, 2022, Plaintiff emailed the President, Hill, and others describing the exploratory discussions he and Tiffany Williams-Parker had at their March 10th meeting at the airport. Plaintiff also mentioned that he would like to give the airport representatives a tour of the campus and have them meet with Howard, Hill, and Gonzales at that time.

3.17     The President responded to Plaintiff by email saying that he was not telling Plaintiff not to explore new programs but to make sure that the time investment with airport collaboration was worth the effort. Plaintiff responded via email saying he would speak to Hill and Williams-Parker about the President's directive and agree to a way forward. Plaintiff then did so.

3.18     On March 17, 2022, After speaking with Hill and Williams-Parker, Plaintiff emailed the President and asked him if would agree to meet with the Airport Manager and interim

---

[2] Plaintiff had previously met Chris Meaux at the Beaumont airport in connect with his daughter's search for a new flight school in Beaumont.

City Manager about the airport collaboration when they come to LIT campus for a tour.  The President not only agreed to the meeting but suggested that Plaintiff also invite the permanent City Manager to "help pave the way for further strategic collaboration with the City of Beaumont." Plaintiff assumed from the President's response that the President was fully supportive of Plaintiff's efforts to investigate a possible collaboration and the upcoming campus tour and meeting.

3.19    The meeting and tour was then scheduled on the calendars of the President, Hill, and Gonzales for March 31, 2022. Plaintiff emailed Hill on March 29, 2022, to update her on the campus tour and remind her that she and Gonzales would be meeting with the airport representatives at 1:00 on the 31st. Hill replied OK to this paragraph in Plaintiff's email.

3.20    At no time during the period from March 17, 2022, to March 31, 2022, did the President or Hill make any mention to Plaintiff that he should not schedule the tour and meeting, Moreover, neither the President nor Hill told Plaintiff during this time that that he was mishandling his attempts to get the programs up and running or that he was exceeding his authority.

**Plaintiff Attempts to Discipline One of his Direct Reports**

3.21    During this same time, on March 10, 2022, Plaintiff, in the normal course of his duties as supervisor of the Workforce Department, conducted a meeting of his Workforce staff which included a number of people including Prince and Williams-Parker. At the meeting, Prince, in front of the rest of Plaintiff's staff raised his voice to Plaintiff over various matters saying, in part, that he and Plaintiff were having a "pissing contest" over matters on which they disagreed.

3.22    After the meeting, Plaintiff emailed Prince and told him that his behavior in the meeting was "aggressive and disrespectful."  Plaintiff further stated: "[a]s your supervisor, please note that my expectation is for you and the team to exhibit a positive and cooperative work attitude

which will help foster collegiality and collaboration to achieve LIT's vision and Workforce objectives."

3.23    In response to Plaintiff's email, Prince emailed Plaintiff and, again being disrespectful, listed multiple criticisms of Plaintiff stating:

> Lastly, my work ethics and attitude has contributed to $1 million dollars in grants funding within two years. <u>So, the "fostering" and "collaboration" to achieve LIT's vision and Workforce objectives has been achieved prior to your installation in December 2021</u>. (Emphasis added.) Prince asked for a meeting for the two of them to discuss the issues with the President, Hill, and Gonzales.

**<u>Hill Refuses to Allow Plaintiff to Issue a Verbal Warning to Prince</u>**

3.24    On March 18, 2022, the President met with Hill, Plaintiff, and a representative from the HR Department regarding Prince.  In the meeting the President asked Hill and Plaintiff to meet with Prince regarding any outstanding issues.

3.25    On March 21, 2022, Hill met with Plaintiff and Prince about their March 10th meeting and resulting emails. Hill did not support Plaintiff in this meeting. Her lack of support for Plaintiff as Prince' supervisor was shown in her March 22, 2022, email to Prince and Plaintiff summarizing their meeting. Hill stated that their meeting added:

> much needed clarification regarding your alleged use of inappropriate language (i.e., 'pissing contest') and behavior ('raised voices/yelling') during a DWA meeting (March 10) attended by Dr. Pfang and two other LIT colleagues. However, you denied these allegations but did express concern about a lack of communication regarding the DWA MOU. This was not intentional and I have asked Dr. Pfang to ensure all employees in the Workforce Department are kept well informed.

Hill clearly accepted Prince's denial of his behavior at the March 10th meeting with Plaintiff and other staff. Further, Hill also accepted Prince's criticism of Plaintiff.

3.26    Later that day, Plaintiff emailed Hill asking her to review a warning that Plaintiff, as Prince's direct supervisor, wanted to give Prince for his inappropriate behavior at the March

10th meeting. In the email, Plaintiff told Hill that he wanted to run the email by her before he sent it; he explained that Beth Knape (Director of HR) had already reviewed the content.  Hill responded via email asking Plaintiff to call her and stating: **"Our conversation with Byron yesterday closed this matter and a verbal warning (double jeopardy) is not needed at this time."** (Emphasis added.) Plaintiff called Hill as requested and she stated that a verbal warning was not necessary. Plaintiff felt unsupported by Hill in his effort to correct Prince's disrespectful behavior toward him and Prince's failure to follow Plaintiff's instructions as his supervisor. And, as shown below, despite what Hill told Plaintiff, the matter was not closed because soon thereafter the President and Prince would team up to publicly criticize and humiliate Plaintiff.

**Meeting with Howard Regarding Prince's Complaints About Plaintiff**

3.27    On April 1, 2022, the President asked Plaintiff to come to his office. Plaintiff was given no previous notice that he was to meet with the President. When Plaintiff arrived at the President's office Hill, Gonzales, Prince, and Parker-Williams were there. As Plaintiff would learn, the President had called the meeting so that he and Prince could raise multiple criticisms of Plaintiff in front of other members of the Executive Team.

3.28    During the meeting, the President allowed Prince to criticized Plaintiff for mishandling the first meeting with the representatives at Beaumont Regional Airport and tell Plaintiff and the group that Plaintiff did not know how to deal with community business leaders. Prince had little, if any, personal involvement in the airport meetings and more importantly, Prince was not in charge of developing new programs for LIT. However, the President allowed Prince to openly criticize Plaintiff as if Prince was Plaintiff's supervisor.

3.29    The President also commented and criticized Plaintiff reading from various emails on which Plaintiff had not been copied. The emails appeared to be from Prince to the President.

Having not seen the emails, Plaintiff found it difficult to respond to the President's and Prince's criticisms.

3.30    The President showed little, if any support in the meeting for Plaintiff as Prince's supervisor. At the end of meeting, instead of supporting Plaintiff regarding Prince's lack of respect and criticisms of Plaintiff, the President merely told Plaintiff that he and Prince needed to learn to get along. Plaintiff was totally humiliated in this meeting. Prince clearly had the President's backing in the meeting as shown by the President's acceptance of Prince's criticism of Plaintiff as fact, and the President's treatment of Prince as if Prince and Plaintiff were, at least, on the same level in the LIT hierarchy.

3.31    On April 4, 2022, a few days after this meeting, Hill announced to Plaintiff and his staff that she was going to conduct an "investigative meeting" with them. Plaintiff was not told the subject of the meeting but suggested to Hill that perhaps he should not attend the meeting so his staff would feel free to talk about whatever was being investigated. Accordingly, Plaintiff did not attend the meeting but Hill never informed him of the subject of or the results of the meeting.

3.32    Although Plaintiff cannot recall exactly when the conversation occurred, somewhere around this time, Plaintiff was in a meeting with the President, Hill, Gonzales, and possibly others. During the conversation about the airplane maintenance program, Howard remarked how all things came together so quickly and that this was mismanaged (by Plaintiff). Howard asked, "yes or no; do you agree?", he went from one person to the next. Hill replied yes. He then asked Gonzales, who seemed to struggle but agreed "yes." Howard then asked Plaintiff and he said it was managed as well as it could be. Then, Howard said that he heard what he wanted to and asking Hill and Gonzales to stay behind and he dismissed Plaintiff from the meeting.

**Hill Issues a Verbal Warning to Plaintiff**

3.33    On April 12, 2022, Hill met with Plaintiff. The meeting was approximately two weeks after the meeting where Prince and the President criticized Plaintiff's work on the development of programs with the City of Beaumont. At the meeting Hill gave Plaintiff a "verbal warning" for his purported "mismanagement of the aviation program proposal to external stakeholders." Her "verbal warning" included Plaintiff's failure to keep her informed of "potential external opportunities and meetings prior to confirming LIT's participation." Hill's accusations were not accurate. The "verbal warning" was followed by an email to Plaintiff confirming the "verbal warning." Hill's verbal warning to Plaintiff came after she had previously refused to let Plaintiff give Prince a verbal warning for being disrespectful and failing to follow Plaintiff's instructions. The warning also came after the President "polled" Hill and Gonzales for their opinion of whether the aviation program proposal had been mismanaged.

3.34    In the meeting with Hill, Plaintiff mentioned that he had always kept her informed, that the meetings were purely exploratory, and he made no commitments on behalf of LIT to anyone. Plaintiff also told Hill in the meeting that the person who needed the verbal warning was Byron Prince. After the meeting Dr. Pfang went to the Human Resources Department at LIT and spoke with its Director, Beth Knape about his meeting with Hill and the verbal warning she had given him.

3.35    Prior to the April 1st meeting and the "verbal warning" Plaintiff had not been told by either Howard or Hill that his job performance was lacking. In fact, after Hill was appointed Provost, Plaintiff was given increasingly more responsibilities by the President and at the time he was terminated, Plaintiff had a much larger portfolio of responsibilities that any other member of the President's Executive Team.

**Dr. Pfang Files a Grievance Against Dr. Hill**

3.36    The morning of the next day, April 13, 2022, Plaintiff responded to Dr. Hill's email regarding the "verbal warning" and copied the Director of Human Resources. He again told Hill that he had not made any commitments for LIT regarding the aviation program and any meetings were purely exploratory in nature. He also attached emails to show that he had kept her informed of his meetings with external stakeholders.

3.37    Plaintiff stated further that he did not deserve a "verbal warning" but Byron Prince did in connection with his disrespectful and inappropriate behavior at the March 10, 2022, meeting. Plaintiff told Hill in his email that "instead of addressing the issues with Byron and supporting me in initiating a disciplinary process, you have instead undertaken to undermine my authority and ignored Byron's repeated blatant failure to fully comply with my instructions."

3.38    Plaintiff further stated to Hill that as an Asian immigrant, her discipline of him was "unjust and inappropriate".  He continued stating: "In contrast to Dr. Prince, who is an African American non-immigrant, has not been disciplined in spite of:

　　　　1. Unprofessional and crude behavior,

　　　　2. Not following the established administrative channels, going straight to President Howard and yourself with complaints,

　　　　3. Reluctantly and unsatisfactorily completing assigned duties,

　　　　4. Publicly insulting his superior's management style and accusing him of unjustified misdemeanors,

　　　　5. Dr. Prince has not been given a verbal warning by you instead you said your conversation with him 'closed this matter', and

　　　　6. Dr. Prince's behavior has not been examined in front of five of his colleagues as I have been.

3.39    Plaintiff told Hill that he hoped his grievance could be resolved in an equitable and fair manner with the retraction of the verbal warning and a written apology. **Finally, Plaintiff told Hill that "…in view of you and Dr. Howard's being of the same race as Dr. Prince, I request this matter be referred to the Chancellor's Office to be investigated fairly, without racial prejudice."** (Emphasis added.)

**Dr. Hill Retaliates Against Dr. Pfang**

3.40    On the afternoon of April 13, after Plaintiff sent his grievance email to Hill and the HR Department, Hill wrote a series of emails to Plaintiff and others regarding a vehicle accident involving an LIT Truck Driving Instructor and an LIT vehicle which occurred on March 16, 2022. Truck Driving Instruction was in the Workforce Department that was part of Plaintiff's job responsibilities.[3]

3.41    It is clear from emails that on March 31, 2022, Hill was made aware of the accident; however, after Plaintiff filed his grievance with the HR Department at LIT, Hill emailed Plaintiff and asked him if he had informed her directly of the accident. Plaintiff replied to Hill on the morning of April 14th stating: "I too cannot recall and do not think I specifically informed you; I shall do so in the future."

3.42    Later on April 14, 2022, Dr. Hill called a meeting with Plaintiff and others to get an "overview" of the accident. This was the beginning of an investigation that would lead to Plaintiff's termination for the purported reason that Plaintiff failed to tell Hill about the accident as soon as he learned of it.

---

[3] Plaintiff, when he became aware of the accident on March 17th, believed he was following the correct procedure at LIT by asking his executive assistant to inform Bishell Appu, Accounting Associate Finance (African American), responsible for insurance/risk management, Ms. Appu reported to the VP and CFO, Gonzales.

3.43    The April 14th meeting was just one of several meetings held by Hill to determine when Plaintiff gave her notice of the accident. During this meeting, the President and Hill learned that the LIT employee who had the accident was not covered by LIT's insurance and neither were any of the other employee driving instructors.

3.44    The President and Hill also learned at the meeting that there was no procedure in place to assure that new employee drivers were added to LIT's insurance policies. Insurance coverage was area of responsibility of VP Gonzales, who was also a member of the President's Executive Team. These errors by Gonzales were of much greater import to LIT than when Plaintiff informed Hill of the accident. However, Gonzales was not criticized, disciplined, or terminated for errors that could have been far costlier to LIT than Plaintiff's failure to "timely" inform Hill of the accident. In the meeting, Gonzales was merely told to get insurance coverage immediately on LIT's drivers.

**Hill Responds to Plaintiff's Notice of Grievance**

3.45    On April 18, 2022, five days after Plaintiff gave notice of grievance to Hill and the HR Department, Hill responded to Plaintiff's grievance saying that she declined to retract her "verbal warning" and provide a written apology. She further stated that the verbal warning matter related to the mismanagement of the aviation program "is closed." Dr. Hill also copied the Human Resources Director "for further review and to address your concerns."

**Hill Continues to Investigate the Matter of When Plaintiff Gave Her Notice of the Accident**

3.46    Also, on April 18, 2022, Hill asked Plaintiff to construct a timeline of events relating to the March 16th accident showing to whom and by whom notice of the accident was given. Plaintiff prepared the timeline as directed.

3.47    On Thursday, April 21, 2022, the President and Hill held a "factfinding" meeting related to the accident, chaired by Gonzales which included Executive Team members and others. At the meeting the President stated that those who were Directors and below had properly informed their supervisors of the accident, thereby implying that the Associate Vice President (Plaintiff), and Vice-Presidents (namely Hill and Gonzales) failed to do so. Yet, only Plaintiff was terminated that day by Hill as discussed below.

**Dr. Hill Tells Dr. Pfang to Resign or Be Terminated**

3.48    After the "factfinding" meeting late in the day, on April 21, 2022, Hill and Gonzales came to Plaintiff's office. Dr. Hill gave Plaintiff a letter explaining what a serious matter it was that he had failed to inform her of the accident at the time it happened.[4] She stated in the letter that his failure to notify her of the accident constituted "a failure to follow protocol and demonstrates poor judgment." She concluded the letter by saying that a copy of this written reprimand would be put in his personnel file.

3.49    The letter did not refer to any continuing poor performance by Plaintiff nor did it mention termination; however, attached to the letter was a severance and release agreement. Hill told Plaintiff that he could sign the severance agreement and receive two months' severance pay or he would be terminated. She said that he had until the following day to make his decision. Dr. Pfang did not resign and was terminated effective April 21, 2022.

**The President and Hill Failed to Follow LIT's Policies for Complaints of Racial Discrimination**

3.50    Although, Plaintiff filed a grievance against Hill for racial discrimination with LIT's HR Department, Hill terminated Plaintiff's employment before HR had time to investigate

---

[4] Ironically, Hill brought with her as a witness the LIT Vice President and member of the President's Executive who had failed to obtain insurance for all of LIT's truck driver employees, yet Plaintiff was being terminated for failing to tell Hill of the occurrence of an accident.

Plaintiff's charges. Interestingly, Beth Knape, Director of LIT's HR Department contacted Plaintiff the day after he was terminated. Plaintiff told her that he had been terminated and she told him that she was not aware of his termination.

3.51    Knape later called back and told Plaintiff she was still going to conduct the investigation of his grievance pursuant to LIT's policy even though he had been terminated. She asked for Plaintiff's participation in the investigation. Plaintiff's counsel informed Ms. Knape, through LIT's attorney, that Plaintiff would not participate in the investigation. Plaintiff's counsel was later informed that Ms. Knape had found no evidence to support Plaintiff's claims.

## IV.    CAUSES OF ACTION

4.1    The following causes of action are pled alternately insofar as same may be necessary.

4.2    Plaintiff incorporates herein each allegation of Paragraphs 3.1 through 3.51.

4.3    Title VII prohibits discrimination based on race, color, religion, sex, or national origin. *See* 42 U.S.C. §2000e-2(a)(1). It also prohibits harassment and retaliation for asserting rights under Title VII. *See* 42 U.S.C. §2000e-3(a).

4.4    Plaintiff timely dual-filed a charge of discrimination in employment against LIT on May 19, 2022, in administrative proceedings with the Texas Workforce Commission Civil Rights Division and the Equal Employment Opportunity Commission, in which he asserted that he was treated in a disparate and discriminatory manner due to his race and national origin, was harassed, and retaliated against by LIT for asserting his  rights thereunder, all in violation of federal law (including Title VII of the 1964 Civil Rights Act).  Having now received his right to sue letter, from the Texas Workforce Commission issued December 19, 2022, he has exhausted his administrative remedies with respect to his federal law discrimination claims. Plaintiff now timely

brings such claims in this Original Complaint.

4.5    The conduct of LIT, set forth above damaged Plaintiff by depriving him of his continued salary and requiring him to seek other employment.

**A.    Race, National Origin, Ethnicity, Harassment and Retaliation Section 703(a) of Title VII, 41 U.S.C. § 2000e-3(a), and 42 U.S.C. §2000e-3(a).**

4.6    The conduct described herein is violative of Title VII as it constitutes racial discrimination, discrimination based on ethnicity and/or national origin, harassment, and retaliation.

4.7    Title VII prohibits discrimination based on race, color, religion, sex, or national origin. *See* 42 U.S.C. §2000e-2(a)(1). It also prohibits harassment and retaliation for asserting rights under Title VII. *See* 42 U.S.C. §2000e-3(a).

4.8    Immediately after Plaintiff was hired by the President of LIT, he was given an additional portfolio of Departments and areas for which he was responsible. While Plaintiff welcomed the additional responsibility, he soon learned that his authority to oversee the new responsibilities was being denigrated by the President; by Hill, the Provost; and by Prince, one of Plaintiff's direct reports.

4.9    Within a couple of months of Plaintiff's hiring, the President began to make disparaging and critical comments about Plaintiff in meetings with Plaintiff, other Executive Team members, and staff.

4.10    The President also viewed one of Plaintiff's subordinates, Prince, as if he and Plaintiff were at least equals at LIT and in some instances, the President and Hill treated Prince as if Prince was Plaintiff's supervisor. In so doing, the President allowed Prince to be openly critical, dismissive, and insulting of Plaintiff in meetings with Plaintiff, Plaintiff's superiors, and colleagues. Importantly, both the President and Hill, Plaintiff's direct supervisor, adopted Prince's

criticisms of Plaintiff using them to discipline Plaintiff for purported poor performance. These actions of the President, Hill and Prince against Plaintiff were all in violation of the protections of Title VII.

4.11    As noted above, Plaintiff was retaliated against, by Hill and the President after he notified her and the HR Department of his complaints about how she had supported Prince, another African American over him, a Chinese immigrant. Plaintiff, as Prince's superior, had tried to discipline Prince for his inappropriate behavior and refusal to follow Plaintiff's instructions. Hill refused to allow Plaintiff to give Prince a written warning about these things.

4.12    Additionally, shortly after Plaintiff notified Hill of his grievance, Hill and the President began an "investigation" which was actually a campaign of harassment and retaliation which ultimately resulted in Plaintiff's termination purportedly related to the LIT vehicle accident and was pretext to fire Plaintiff.

4.13    Despite Plaintiff telling Hill on April 14, 2022, that he did not recall informing her of the accident and that he would do so in the future, Hill asked Plaintiff to create a timeline of events surrounding the accident to show who knew of the accident and who had informed their supervisors. Additionally, Hill also had one or more meetings related to when supervisors were informed of the accident.

4.14    This "investigation" conducted by Hill and the President lasted for a number of days; however, if Hill viewed Plaintiff's failing to "timely" inform her of the accident as an event for which he should be terminated, Hill could have fired Plaintiff on April 15, 2022. Instead, Hill and the President continued conducting their "investigation" and further retaliating, harassing, and humiliating Plaintiff, before they fired him. Their actions violated Title VII's prohibition against racial, national origin, and ethnic discrimination. Their actions also constituted harassment, and

retaliation which are also barred by Title VII. Additionally, Plaintiff's termination for his failure to "timely" notify Hill of the accident was mere pretext and, in retaliation for filing his grievance against Hill.

**B.    Breach of Contract**

4.15    Plaintiff alleges a state court pendant cause of action for breach of contract.

4.16    At all relevant times, Plaintiff was an employee of LIT pursuant to a letter of employment dated November 15, 2021, between Plaintiff and the President of Defendant LIT ("Contract"). Because LIT is a component institution of TSUS, the policies and procedures of both LIT and TSUS were a part of Plaintiff's Contract and Plaintiff fully performed under the Contract.

4.17    LIT breached Plaintiff's Contract by violating its policies. While the written employment contract was still in effect, LIT was barred by their own policies from retaliating against Plaintiff for filing a grievance based on racial and ethnic discrimination. However, as set forth above, in retaliation for Plaintiff's fully justified actions in filing the grievance with LIT's HR Department, **Plaintiff was terminated by Hill less than ten days after filing his grievance against her**. LIT's termination of Plaintiff was a breach of LIT's policies, and therefore a breach of his employment contract.

4.18    As a direct and proximate result of Defendant's breaches of contract, Plaintiff has been damaged as set out below.

**C.    Due Process Violation**

4.19    Plaintiff's contract with LIT created property rights. LIT deprived him of such rights without due process. At all relevant times, Plaintiff's employment relationship with LIT was contractual, and the policies of LIT and TSUS became a part of Plaintiff's employment contract, whether that contract was for a term or at-will.  When LIT terminated its contract with Plaintiff,

he was entitled to due process.

4.20    Here, LIT's policies also restricted LIT from terminating Plaintiff as retaliation, or based on his race, national origin, and/or ethnicity. These limits created a property interest, of which Plaintiff could not lawfully be deprived without due process. Defendants denied Plaintiff such due process by terminating his employment in retaliation for filing a grievance against Dr. Hill, and further based on his race, national origin, and/or ethnicity, without due process. Defendants did not provide Plaintiff with a due process hearing which is and was a prerequisite to any such adverse employment actions.

4.21    Thus, in addition to his constitutional right of due process Plaintiff had a contractual right of due process.

## D.    Substantive Due Process

4.22    The above-described conduct of LIT is a violation of Plaintiff's right of substantive due process. The acts and omissions described herein above by LIT comprises arbitrary and capricious conduct by the LIT and that arbitrary and capricious conduct is superimposed upon Plaintiff's contractual and property interest as described above. Plaintiff has been damaged as a direct and proximate result of that arbitrary and capricious conduct, and seeks relief as set forth below.

## V.    DECLARATORY RELIEF

5.1    Additionally, and/or in the alternative, Plaintiff would show that a justiciable controversy has arisen regarding the rights and obligations of Plaintiff and Defendant, in part, pursuant the Policies and Procedures of Lamar Institute of Technology including but not limited to LIT's Policies and Procedures Manual, Revised 2020, Policy 2.2 Racial and Other Forms of Harassment, and Policy 5.6 Administrative Officers Employment/Termination. Therefore,

Plaintiff seeks relief from this Court pursuant to 28 U.S.C. Sec. 2201(a) and/or Chapter 37, TEX. CIV. PRAC. & REM. CODE, declaring that LIT's policies, and the United States Constitution and Texas Constitution, bar Defendants and their administrators from the arbitrary penalties, including termination given to Plaintiff documented herein.

## VI.    DAMAGES

6.1    Plaintiff's annual salary at the relevant times was $115,000, with an additional stipend of $8,000 for the role of Special Assistant to the President. He has been deprived of that salary in its entirety and has lost the benefit of his health insurance, pension, and other benefits. Plaintiff is entitled to his damages of lost income to be determined as we proceed, and he is entitled to front-pay for which the jury is entitled to speculate under Texas and Federal law. Despite diligently applying for numerous positions and have many interviews, Plaintiff has been unable to date to obtain comparable employment at a comparable salary. Thus, he has suffered a diminished earning capacity.

6.2    Plaintiff is entitled to recover a reasonable sum for his mental anguish, for which he here sues.

6.3    For a deprivation of procedural due process, Plaintiff is entitled, as a matter of law, to recover at least nominal damages and his attorney's fees.

## VII.    ATTORNEY'S FEES

7.1    Plaintiff is entitled to recover his reasonable and necessary attorney's fees both under 42 U.S.C Sec. 1988, for breach of contract under Chapter 38 of the Texas Civil Practice & Remedies Code, and for declaratory relief under Chapter 37 of the Texas Civil Practice & Remedies Code, for which he herein sues.

## VIII.   CONDITIONS PRECEDENT

8.1     All conditions precedent for the filing of this claim have been met.

## IX.     DEMAND FOR JURY TRIAL

9.1     Plaintiff respectfully demands a jury trial before a jury of his peers.

## PRAYER

Plaintiff respectfully prays that the Court will grant judgment to Plaintiff providing for the

following:

a.      the recovery of his actual damages including back pay and front pay; and/or

b.      at least the recovery of nominal damages;

c.      the recovery of his attorney's fees, costs, expenses, and expert witness fees;

d.      pre-judgment and post-judgment interest; and

e.      such other and further relief, both general and special, at law and equity, to which
        Plaintiff may show himself entitled.


Respectfully Submitted,

*/s/ Frank Hill\_\_*
Frank Hill              SBN  09632000
fhill@hillgilstrap.com

**HILL GILSTRAP, P.C.**
1400 W. Abram St.
Arlington, Texas 76013
(817) 261-2222
(817) 861-4685 FAX

**ATTORNEYS FOR PLAINTIFF**