**UNITED STATES DISTRICT COURT**            **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| RAYMOND PFANG, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 1:23-CV-93 |
| | § | |
| LAMAR INSTITUTE OF TECHNOLOGY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the court is Defendant Lamar Institute of Technology's ("LIT") Partial Motion to Dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) (#6). Plaintiff Raymond Pfang ("Pfang") filed a response to LIT's motion (#12), and LIT filed a reply (#13). Having considered the motion, the submissions of the parties, the record, and the applicable law, the court is of the opinion that LIT's motion should be denied.

I.   Background[1]

 Pfang alleges he is of Chinese descent and is a naturalized citizen of the United States. He received his MBA from the University of Greenwich in London, England, and his Ph.D. in Management from the University of Surrey Business School in Guildford, England. Before immigrating to the United States in 2011, Pfang was employed as the Director of Operations for Infocheck Ltd., UK, was the founding CEO of NES HealthCare, UK, and later was the Program Director for the MA in Global Management, Senior Lecturer and Director, Regents Business

---

[1] The facts recited in this opinion are taken from Pfang's Original Complaint (#1). At this stage, the court does not make any factual findings or determinations; rather, the court accepts Pfang's well-pleaded facts as true for the purpose of deciding the present motion. *See, e.g.*, *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013) (noting that at the 12(b)(6) stage, the court must construe all facts in favor of the non-moving party); *Lytle v. Bexar County*, 560 F.3d 404, 409 (5th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)), *cert. denied*, 559 U.S. 1007 (2010).

Forum, all at Regent's University Business School in London, England.  Once in the United States, and prior to his employment with LIT, Pfang was employed from 2013 through 2021 in administrative positions varying from Dean, Assistant Dean, and Assistant to the President, at Tarrant County College in Fort Worth, Texas, and Palo Alto College in San Antonio, Texas.

Plaintiff applied for the position of Associate Vice President of Education Support at LIT on October 29, 2021.  The President of LIT at that time was Dr. Lonnie Howard ("Howard").  Howard, according to Pfang, emailed him the next day, informing him that he was "impressed with his cover letter and *curriculum vitae.*"  On November 2, 2021, Howard flew to San Antonio, Texas, to interview Pfang.  Pfang alleges that on that same day, Howard not only offered him the position of Associate Vice President of Education Support, but also offered him the additional post of Special Assistant to the President.  Pfang accepted both positions, believing he would be a member of Howard's "Executive Team," which would require him to work with Howard and other LIT Administrators.

Pfang contends that during his interview, Howard told him he would mentor Pfang to the position of president of a college or university, impressing upon Pfang that he had successfully mentored three other individuals to that position.  Pfang received a written offer on November 15, 2021, which Pfang accepted.  Pfang began his employment with LIT on December 1, 2021, but was terminated from his position by LIT Provost Angela Hill ("Hill") on April 21, 2022.

According to Pfang, shortly after he began his employment with LIT, another Associate Vice President ("AVP") unexpectedly resigned from her position as AVP for Workforce and Strategic Initiatives.  Pfang alleges that Howard asked him to oversee the duties of the former AVP on a temporary basis until a replacement could be hired.  Plaintiff states that he led the

search and developed a short list of candidates for the open AVP position.  Rather than hire a replacement to fill the vacant position, however, Howard, according to Pfang, terminated the search and decided not to fill the position.  Pfang alleges specifically that Howard asked him to take over the position and he complied with the request.  Including his responsibilities as AVP for Workforce and Strategic Initiatives, Pfang oversaw several departments including Marketing, Institutional Effectiveness, Assessment and Research, Grants, New Program Development, the LIT Foundation, professional truck driver training, and the staff associated with these departments.  Plaintiff alleges he received no additional pay for assuming the new duties and, despite his request for additional assistance, he received none.

Howard also asked Pfang to "reorganize the administrative structure of the campus from top to bottom."  According to Pfang, over a period of weeks, he began talking with other Executive Team members and certain LIT staff, and ultimately provided Howard with his proposal, which included written explanations of the reason for realignment.  Around this same time, Dr. Byron Prince ("Prince"), one of Pfang's direct reports as AVP of the Workforce Department, told Pfang that Howard had asked Prince to prepare a proposed reorganization chart of the Workforce Department, showing Prince as the AVP of the department.  Pfang avers that he was surprised to learn this because he was the current AVP of the Workforce Department and Howard knew that, under Pfang's reorganization proposal, Pfang would remain as AVP of that department.  According to Pfang, he ultimately remained as AVP of the Workforce Department and continued as Prince's supervisor.  Pfang contends that this was the first instance in which Howard undermined his respect and authority in his position as Prince's supervisor.  Pfang specifically alleges that both Howard and Prince are African American.

Around February 15, 2022, Howard named Hill as LIT's Vice President of Instruction and Provost.  Pfang specifically alleges that Hill is also African American and "had far less experience to serve in these positions" as compared to Pfang.  After Hill's appointment, Howard informed Pfang that he would now report directly to Hill.  Pfang states that all the other members of the President's Executive Team also began reporting directly to Hill, with the exception of Rudy Gonzales ("Gonzales"), who was the Vice-President of Finance and Operations.  The other members of the President's Executive Team were Gonzales, Veronica Garcia ("Garcia") as Associate Vice-President, Ken Mason ("Mason"), and Andrea Stephenson ("Stephenson").[2] According to Pfang, both Gonzales and Garcia are Hispanic, while Mason and Stephenson are Caucasian.

Plaintiff alleges that Howard conducted an Executive Team meeting the next day.  During the meeting, and in front of the other Executive Team members, Pfang asserts that Howard mentioned to him and Garcia that "if being at LIT did not fit into their career plans, he would be willing to make a call," presumably to assist in finding them other jobs.  According to Pfang, in what appeared to be a goodwill gesture, Howard also offered to waive the obligation for them to repay their relocation allowances.  Pfang contends that he "had no idea" why Howard would make the comment and/or offer, particularly during an Executive Team meeting.  The following morning, according to Pfang, he emailed Howard thanking him for the offer.  Thereafter, Howard called and assured Pfang that he did not want him to leave his employment with LIT.

On or around February 15, 2022, Howard spoke at a convocation town-hall meeting of LIT's campus faculty and staff.  During this meeting, and without prior consultation with Pfang,

---

[2] Plaintiff does not identify the positions Mason and Stephenson held.

4

Howard announced that the position of Special Assistant to the President was vacant and open for anyone who was interested in applying.  Plaintiff was "shocked and surprised" to learn this in a public forum as this was one of the original two positions for which he was hired and received an $8,000.00 stipend.  Pfang construed this announcement by Howard to mean he was being removed from the position.  After the meeting, Pfang emailed Howard and advised him that because he was no longer the Special Assistant to the President, he should no longer receive the stipend for the position.  Pfang also spoke with Gonzales, the CFO, about surrendering the stipend.  Gonzales informed Pfang that the President told him it was not necessary for Pfang to surrender the stipend. Howard ultimately never filled the position and continued to refer to Pfang as the Special Assistant to the President up to the time of Pfang's termination.

In line with his duties as AVP of Workforce and Strategic Initiatives, Pfang emailed Howard on December 7, 2021, with a list of possible classes and programs that would benefit LIT. Two of the recommendations were an aviation maintenance program and a private pilot's associates degree.  Thereafter, Pfang emailed the City of Beaumont Regional Airport manager and proposed a meeting to discuss the possible development of these two programs.[3]  Plaintiff copied Hill, his now direct supervisor, on the email to keep her apprised of his plans to meet regarding the development of these programs. Pfang received no response from Hill and scheduled the meeting for March 10, 2022, at the Beaumont Regional Airport.  Pfang, along with Tiffany Williams-Parker ("Williams-Parker"), who is African American, attended the meeting for LIT.[4]

---

[3] Pfang previously met with Chris Meaux at the City of Beaumont Regional Airport in connection with his daughter's search for a new flight school in Beaumont.

[4] Pfang does not identify the position Williams-Parker held with LIT.

On March 14, 2022, Pfang emailed Howard, Hill, and others describing the exploratory discussions he and Williams-Parker had at the March 10, 2022, meeting.  Pfang mentioned that he would like to give the airport representatives a tour of the campus and arrange a meeting with Howard, Hill, and Gonzales during that time.  Howard responded by email stating that he was not telling Pfang not to explore a new program but to make sure that the time investment with airport collaboration was worth the effort.  Pfang responded via email stating he would speak to Hill and Williams-Parker about Howard's directive and agree to a way forward.

After speaking with Hill and Williams-Parker, Pfang emailed Howard on March 17, 2022, and asked if he would agree to meet with the Beaumont Regional Airport Manager and the Interim City Manager about the collaboration on their tour of the LIT campus.  According to Pfang, Howard agreed to the meeting and also suggested that Pfang invite the permanent City Manager to "help pave the way for further strategic collaboration with the City of Beaumont."  Pfang assumed from this response that Howard was on board with his efforts.

The meeting and tour were scheduled on the calendars of Howard, Hill, and Gonzales for March 31, 2022.  Pfang emailed Hill on March 29, 2022, to update her on the campus tour and remind her that she and Gonazales would be meeting with the airport representatives at 1:00 p.m. on March 31, 2022.  Hill responded to the email, stating, "OK."  According to Pfang, at no time during the period of March 17, 2022, to March 31, 2022, did Howard or Hill mention to Pfang that he should not schedule the tour and meeting.  Pfang also avers that, during this time, neither Howard nor Hill informed him that he was mishandling his attempts to get the programs up and running or that he was exceeding his authority.

Around this same time, on March 10, 2022, Pfang in the normal course of his duties as supervisor of the Workforce Department, conducted a meeting of his Workforce Department staff, which included a number of people, including Prince and Williams-Parker.  At this meeting, in front of all the staff present, Prince raised his voice to Pfang over various matter saying, in part, that he and Pfang were having a "pissing contest" over matters on which they disagreed.  After the meeting, Pfang emailed Prince and informed him that his behavior was "aggressive and disrespectful."  Pfang also advised Prince that, "[a]s your supervisor, please note that my expectation is for you and the team to exhibit a positive and cooperative work attitude which will help foster collegiality and collaboration to achieve LIT's vision and Workforce objectives." According to Pfang, Prince responded to the email "being disrespectful" and listed multiple criticisms of Pfang, as follows:

> Lastly, my work ethics and attitude has contributed to $1 million dollars in grants funding within two years. So, the "fostering" and "collaboration" to achieve LIT's vision and Workforce objectives has been achieved prior to your installation in December 2021. (Emphasis added).

Prince asked for a meeting for the two of them to discuss the issues with Howard, Hill, and Gonzales.

On March 18, 2022, Pfang met with Howard, Hill, and a representative from the HR Department regarding Prince.  In the meeting, Howard asked Hill and Pfang to meet with Prince regarding any outstanding issues.  That meeting took place on March 21, 2022, wherein Hill met with Pfang and Prince about their March 10, 2022, meeting and resulting emails.  Pfang contends that Hill did not support him during this meeting.  In a March 22, 2022, email to Pfang and Prince, Hill summarized the meeting and stated the following:

> [M]uch needed clarification regarding your alleged use of inappropriate language (i.e. 'pissing contest') and behavior ('raised voices/yelling') during a DWA meeting (March 10) attended by Dr. Pfang and two other LIT colleagues. However, you denied these allegations but did express concern about a lack of communication regarding the DWA MOU.  This was not intentional and I have asked Dr. Pfang to ensure all employees in the Workforce Department are kept well informed.

Pfang maintains that the response and email show Hill clearly accepted Prince's denial of his behavior at the March 10, 2022, meeting with Pfang and other staff, and approved Prince's criticism of Pfang.

Later the same day, Pfang emailed Hill asking her to review a warning Pfang drafted as Prince's direct supervisor that he wanted to give to Prince.  In the email, Pfang informed Hill he wanted to run the warning by her before he sent it and explained that Beth Knape ("Knape"), the Director of Human Resources, had already reviewed the content.  Hill responded to Pfang, asking Pfang to call her, and stated, "Our conversation with Byron yesterday closed this matter and a verbal warning (double jeopardy) is not needed at this time."  Pfang then called Hill, as requested, and Hill again stated that a verbal warning was not necessary.  Pfang felt unsupported by Hill in his effort to discipline Prince for his behavior and failure to follow through with Pfang's instructions as his supervisor.  Pfang alleges that the matter was clearly not over as Howard and Prince "teamed up" shortly thereafter to publicly criticize and humiliate him.

On April 1, 2022, Howard asked Pfang to come to his office.  Pfang alleges he had no prior notice of the meeting and, when he arrived, Hill, Gonzales, Prince, and Parker-Williams were all present.  Pfang ultimately learned that Howard called the meeting so that he and Prince could raise multiple criticisms regarding Pfang in front of the other members of the Executive Team.  During the meeting, Howard allowed Prince to criticize Pfang for mishandling the first

meeting with the representatives at the Beaumont Regional Airport and to tell Pfang, in front of the group, that he did not know how to deal with community business leaders.  According to Pfang, Prince had little, if any, personal involvement in the airport meetings and was not in charge of developing new programs for LIT.  Despite this, Howard allowed Prince to criticize Pfang openly as if Prince were Pfang's supervisor.  Howard also commented and criticized Pfang by reading various emails on which Pfang was not copied.  Pfang alleges that the emails appeared to be from Prince to Howard.  Having no knowledge of the emails, Pfang found it difficult to respond to the criticisms lodged by Prince and Howard.  Pfang states that Howard showed little, if any, support for him in the meeting.  At the end of the meeting, Howard merely told Pfang that he and Prince needed to learn to get along.  Pfang was completely humiliated in the meeting and believed Prince had the backing of Howard, as shown by Howard's acceptance of Prince's criticisms of him as if Prince and Pfang were on the same level in the LIT hierarchy.

A few days later, on April 4, 2022, Hill announced to Pfang and his staff that she was going to conduct an "investigative meeting" with them.  Pfang had no knowledge of the subject matter but suggested to Hill that he not be in attendance so his staff would feel free to talk about whatever was being investigated.  Accordingly, Pfang did not attend the meeting, and Hill never informed him of the subject matter or the results of the meeting.

Shortly thereafter, Pfang was in attendance at a President's Executive Team meeting with Howard, Hill, Gonzales, and possibly others.  During the meeting, the airport maintenance program was discussed.  Howard remarked about how it came together quickly and that Pfang mismanaged it.  Howard asked the group, "Yes or no; do you agree?"  Howard went to each person in the meeting and asked the same question to which Hill replied, "Yes."  Gonzales

appeared to struggle with his response but agreed, "Yes." When Howard asked Pfang, he stated it was managed as well as it could be. Howard then said that he had heard what he needed, asked Hill and Gonzales to stay behind, and dismissed Pfang from the meeting.

On April 12, 2022, Hill met with Pfang and gave him a verbal warning for his purported "mismanagement of the aviation program proposal to external stakeholders." The verbal warning included Pfang's purported failure to keep her informed of "potential external opportunities and meetings prior to confirming LIT's participation." According to Pfang, Hill's accusations were not accurate. Hill followed the verbal warning with an email to Pfang confirming the verbal warning. Pfang complains that the verbal warning came after Hill refused to allow Pfang to give Prince a verbal warning for being disrespectful and failing to follow Pfang's instructions. Pfang further complains that the verbal warning came after Howard "polled" Hill and Gonzales for their opinion on whether the aviation program proposal had been mismanaged. In the meeting with Hill, Pfang stated that he always kept her informed, the meetings were purely exploratory, and he made no commitments on behalf of LIT to anyone. Pfang also told Hill that the person who needed the verbal warning was Prince. After the meeting, Pfang went to the Human Resources Department at LIT and spoke with Knape about the meeting with Hill and the issuance of a verbal warning. Plaintiff alleges that prior to April 1, 2022, and the issuance of the verbal warning, he had no indication that his job performance was perceived as lacking. In fact, Pfang contends that after Howard appointed Hill as Provost, he was given increasingly greater responsibilities by Howard. Pfang alleges that at the time of his termination, he had a much larger portfolio of responsibilities than any other member of the President's Executive Team.

The next morning, Pfang responded to Hill's email and copied Knape.  Pfang advised Hill that he made no commitments for LIT regarding the aviation program and any meetings were purely exploratory.  Pfang also attached emails to show that he kept Hill informed of his meetings with external stakeholders.  Pfang told Hill he did not deserve a verbal warning, but that Prince did because of his disrespectful and inappropriate behavior on March 10, 2022.  Pfang also lamented to Hill that "instead of addressing the issues with [Prince] and supporting me in initiating the disciplinary process, you have instead undertaken to undermine my authority and ignored [Prince's] repeated blatant failure to fully comply with my instructions."  Pfang also stated in the email to Hill that her discipline of him, as an Asian immigrant, was "unjust and inappropriate."  Pfang stated further that, in contrast, Hill interfered in allowing Pfang to discipline Prince, an African American non-immigrant, despite Prince's:

1.  Unprofessional and crude behavior;

2.  Not following the established administrative channels, going straight to President Howard and [Hill] with complaints;

3.  Reluctantly and unsatisfactorily completing assigned duties;

4.  Publicly insulting his superior's management style and accusing him of unjustified misdemeanors;

5.  [N]ot be[ing] given a verbal warning by [Hill] [but] instead [she regarded her] conversation with [Prince as having] "closed this matter;" and

6.  [B]ehavior [] not be[ing] [discussed] in front of five of his colleagues as [Pfang's] ha[d] been.

Pfang told Hill that he hoped his grievance could be resolved in an equitable and fair manner with the retraction of the verbal warning and a written apology.  Finally, Pfang advised Hill that in

11

"view of you and Dr. Howard's being of the same race as Dr. Prince, I request this matter be referred to the Chancellor's Office to be investigated fairly, without racial prejudice."

Pfang alleges that Hill retaliated against him on April 13, 2022, when she wrote a series of emails to Pfang and others regarding a vehicle accident involving an LIT Truck Driving Instructor and an LIT vehicle which occurred on March 16, 2022.[5]  In this email, Hill asked Pfang if he had informed her directly of the accident.  Pfang states he responded the next day stating, "I too cannot recall and do not think I specifically informed you; I shall do so in the future."  Pfang notes that it was clear from other emails that Hill was made aware of the accident on March 31, 2022.

Later, on April 14, 2022, Hill called a meeting with Pfang and others to get an "overview" of the accident.  Pfang alleges that this was the beginning of an investigation that would ultimately lead to his termination for the purported reason that Pfang failed to tell Hill about the accident as soon as he was notified of it.  During this meeting, Howard and Hill discovered that the LIT employee who was involved in the accident was not covered by LIT's insurance and neither were any of the other employee driving instructors.  Howard and Hill also learned that there was no procedure in place to ensure that new employee drivers were added to LIT's insurance policies.  According to Pfang, insurance coverage was an area of responsibility of VP Gonzales, who was also a member of the President's Executive Team.  Pfang alleges that these errors by Gonzales were of much greater import to LIT than the date when Pfang informed Hill of the accident, yet

---

[5] Pfang concedes that Truck Driving Instruction fell within the Workforce Department that was part of his job responsibilities.  He states that when he became aware of the accident on March 17, 2022, he believed he was following proper procedure when he asked his executive assistant to inform Bishell Appu ("Appu"), Accounting Associate Finance, who was responsible for insurance/risk management and is also African American, of the incident.  According to Pfang, Appu reported to Gonzales, the VP and CFO.

Gonzales was never criticized, disciplined, or terminated for the errors.  Pfang contends that these errors could have been far costlier to LIT than Pfang's alleged error in failing to notify Hill "timely" of the accident.  In the meeting, Gonzales was simply told to obtain insurance coverage immediately on all LIT drivers.

On April 18, 2022, Hill responded to Pfang's grievance saying she declined to retract her verbal warning and provide a written apology.  Hill further stated that the matter relating to the mismanagement of the aviation program "is closed."  Hill copied the Human Resource Director "for further review and to address your concerns."

On the same day, Hill asked Pfang to reconstruct a timeline of events relating to the March 16, 2022, accident, showing to whom and by whom notice of the accident was given.  Pfang prepared the timeline as instructed.  On April 21, 2022, Howard and Hill held a "factfinding" meeting relating to the accident, chaired by Gonzales.  The meeting included Executive Team members and others.  At the meeting, Howard stated that those who were Directors and below had properly informed their supervisors of the accident.  Pfang contends that, in making this statement, Howard implied that the Associate Vice President (Pfang), and Vice Presidents (Hill and Gonzales) failed to do so; yet ultimately, it was only Pfang who was terminated.

After the "factfinding" meeting, Hill and Gonzales came to Pfang's office.  Hill gave Pfang a letter explaining what a serious matter it was that he failed to inform her of the accident at the time it happened.[6]  Hill stated in the letter that this failure constituted "a failure to follow protocol and demonstrates poor judgment."  Hill concluded the letter by saying that a copy of the written

---

[6] Pfang points out, ironically, that Hill brought Gonzales with her as a witness, the LIT Vice President and member of the President's Executive Team who failed to obtain insurance for all of LIT's truck driver employees, while Pfang was the one terminated for failing to inform Hill of the accident immediately.

reprimand would be placed in Pfang's personnel file.  According to Pfang, the letter did not refer to any continuing poor performance by Pfang, nor did it mention termination.  Attached to the letter, however, was a severance and release agreement.  Hill advised Pfang that he could sign the severance agreement and receive two months' severance pay or he would be terminated.  Hill also informed Pfang that he had until the following day to make a decision.  Pfang did not resign and was terminated effective April 21, 2022.

Pfang states that although he filed a grievance against Hill for racial discrimination with LIT's Human Resources Department, Hill terminated his employment before there was time to investigate his complaint.  Knape contacted Pfang the day following his termination, at which time Pfang advised her that he had been terminated.  Knape stated she was not aware of his termination, and she later called Pfang back to inform him she was still going to conduct an investigation into his grievance pursuant to LIT policy.  Knape asked for Pfang's participation, but Pfang declined on the advice of his attorney.  Pfang's attorney was later informed that Knape found no evidence to support Pfang's claim of racial discrimination.

LIT filed its pending partial  motion to dismiss on April 25, 2023.  LIT argues that Pfang's claims should be dismissed because:  (1) Pfang failed to plead sufficient facts that a similarly situated comparator existed and was treated more favorably; (2) Pfang failed to plead sufficient facts that his alleged harassment was based on race; and (3) LIT's Eleventh Amendment immunity and sovereign immunity bar Pfang's procedural due process, substantive due process, and breach of contract claims, as well as his claim for declaratory relief.[7]  In response, Pfang withdraws his claims for breach of contract, his due process claims, and his request for declaratory relief.  As

---

[7] LIT concedes Pfang has alleged sufficient facts to plead a claim for Title VII retaliation.

to Pfang's other claims, he argues that (1) he pleaded sufficient facts regarding his discipline and ultimate termination, as the only Asian administrator among LIT's leadership, giving examples of non-Asian administrators who were treated more favorably and (2) he pleaded sufficient facts regarding the harassment and hostile work environment that he endured, as the only Asian administrator among LIT's leadership, with examples of non-Asian administrators who were treated more favorably.  LIT filed a Reply contending that (1) Pfang's VII discrimination claim fails because he cannot show that he was disciplined or terminated because of his race and (2) his Title VII hostile work environment claim fails because he cannot show that he suffered race-based harassment.

II.    <u>Analysis</u>

A.    <u>Dismissal for Failure to State a Claim under Rule 12(b)(6)</u>

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests only the formal sufficiency of the statement of a claim for relief and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face"); *Spano ex rel. C.S. v. Whole Foods, Inc.*, 65 F.4th 260, 262 (5th Cir. 2023) (quoting *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018)); *Coleman E. Adler & Sons, L.L.C. v. Axis Surplus Ins. Co.*, 49 F.4th 894, 896 (5th Cir. 2022); *IberiaBank Corp. v. Ill. Union Ins. Co.*, 953 F.3d 339, 345 (5th Cir. 2020); *Walker v. Beaumont Indep. Sch.*

*Dist.*, 938 F.3d 724, 734 (5th Cir. 2019).  Such a motion is "not meant to resolve disputed facts or test the merits of a lawsuit" and "instead must show that, even in the plaintiff's best-case scenario, the complaint does not state a plausible case for relief." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 581 (5th Cir. 2020); *Oyekwe v. Rsch. Now Grp., Inc.*, 542 F. Supp. 3d 496, 502 (N.D. Tex. 2021); 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1356 (3d ed. 2019).  In ruling on such a motion, the court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff. *Hernandez v. Mesa*, 582 U.S. 548, 550 (2017); *Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2571 (2022); *IberiaBank Corp.*, 953 F.3d at 345 (citing *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013)); *Walker*, 938 F.3d at 735.  The court, however, does not "strain to find inferences favorable to the plaintiff[ ]" or "accept conclusory allegations, unwarranted deductions, or legal conclusions." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004); *accord Ruvalcaba v. Angleton Indep. Sch. Dist.*, No. 20-40491, 2022 WL 340592, at *3 (5th Cir. Feb. 4, 2022); *Modelist v. Miller*, 445 F. App'x 737, 739 (5th Cir. 2011); *Jones v. Dickerson*, No. CV H-19-3876, 2020 WL 6504456, at *2 (S.D. Tex. Nov. 5, 2020).

"[T]he plaintiff's complaint [must] be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged." *Oscar Renda Contracting, Inc. v. Lubbock*, 463 F.3d 378, 381 (5th Cir. 2006) (citing *Elliott v. Foufas*, 867 F.2d 877, 880 (5th Cir. 1989)), *cert. denied*, 549 U.S. 1339 (2007); *Ramming*, 281 F.3d at 161; *Pathology Lab'y Inc. v. Mt. Hawley Ins. Co.*, 552 F. Supp. 3d 617, 621 (W.D. La. 2021).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp.*

16

*v. Twombly*, 550 U.S. 544, 555 (2007); *accord Spano ex rel. C.S.*, 65 F.4th at 262; *King v. Baylor Univ.*, 46 F.4th 344, 355 (5th Cir. 2022); *Davis v. Tex. Health & Hum. Servs. Comm'n*, 761 F. App'x 451, 454 (5th Cir. 2019); *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 533 (5th Cir. 2016), *cert. denied*, 137 S. Ct. 1374 (2017).   "Where the well-pleaded facts of a complaint do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"   *Walker*, 938 F.3d at 734 (quoting *Iqbal*, 556 U.S. at 678); *accord King*, 46 F.4th at 355.   Hence, "a complaint's allegations 'must make relief plausible, not merely conceivable, when taken as true.'"   *Walker*, 938 F.3d at 734 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009)); *see King*, 46 F.4th at 355; *Longoria ex rel. M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 263 (5th Cir. 2019) ("Though the complaint need not contain 'detailed factual allegations,' it must contain sufficient factual material to 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"   (quoting *Iqbal*, 556 U.S. at 678)).

Generally, the court may not look beyond the four corners of the plaintiff's pleadings. *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 261 (5th Cir. 1999); *see King*, 46 F.4th at 356; *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir.), *cert. denied*, 567 U.S. 936 (2012); *Hicks v. Lingle*, 370 F. App'x 497, 498 (5th Cir.), *cert. denied*, 562 U.S. 1111 (2010).   The court may, however, consider matters that are outside the pleadings if those materials are matters of public record.   *Cox v. Richards*, 761 F. App'x 244, 248 (5th Cir. 2019) (holding the district court's consideration of publicly available records in plaintiff's prior court proceedings on a 12(b)(6) motion to dismiss was proper); *Ruiz v. Brennan*, 851 F.3d 464, 468 (5th Cir. 2017) (citing *Norris*

*v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007)); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (citing *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995)). Furthermore, the court may consider "documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010); *see Innova Hosp. San Antonio, L.P.*, 892 F.3d at 726 ("[A] court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" (quoting *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011))); *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 820 (5th Cir. 2012); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).   A court may also review documents "attached to a response to a motion to dismiss when [they are] sufficiently referenced in the complaint and [their] authenticity is unquestioned." *Am. Gen. Life Ins. Co. v. Mickelson*, No. H-11-3421, 2012 WL 1355591, at *2 (S.D. Tex. Apr. 18, 2012) (citing *Walch v. Adjutant Gen.'s Dep't of Tex.*, 533 F.3d 289, 293-94 (5th Cir. 2008) (relying on documents that were "explicitly referenced in the complaint, acknowledged in the answers, and attached to [Plaintiff]'s opposition to the Defendants' motions to dismiss")); *see Blakely v. Andrade*, 360 F. Supp. 3d 453, 472 (N.D. Tex. 2019); *United States ex rel. Colquitt v. Abbott Lab'ys*, 864 F. Supp. 2d 499, 531 n.9 (N.D. Tex. 2012); *Keel v. Wal-Mart Stores, Inc.*, No. 1:11-CV-248, 2012 WL 488248, at *2 (E.D. Tex. Jan. 11, 2012), *adopted by* No. 1:11-CV-248, 2012 WL 469862 (E.D. Tex. Feb. 14, 2012).

A factual assertion or theory of liability not set forth in the complaint is not properly before the court on a motion to dismiss. *See Law v. Ocwen Loan Servicing, L.L.C.*, 587 F. App'x 790, 793 n.2 (5th Cir. 2014) ("Review of a Rule 12(b)(6) dismissal is, by its very nature, limited to the allegations and theories set forth in the complaint that the district court had before it when granting the motion to dismiss."); *Vandelay Hosp. Grp. LP v. Cincinnati Ins. Co.*, No. 3:20-CV-1348-D, 2020 WL 5946863, at *1 n.3 (N.D. Tex. Oct. 7, 2020) ("This court has repeatedly held that, when ruling on a motion to dismiss, the court does not consider additional facts that are alleged in a response brief but not in the complaint." (collecting cases)); *Mohamed v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 620 n.10 (N.D. Tex. 2017) (rejecting plaintiff's attempt to introduce a theory of liability for the first time in response to defendant's motion to dismiss); *Elton Porter Marine Ins. Agency v. Markel Am. Ins. Co.*, No. H-11-4432, 2012 WL 2050254, at *2 (S.D. Tex. June 6, 2012) ("[I]t is insufficient to allege further facts in the response to the motion to dismiss; the factual matter must be contained in the pleadings themselves.").

"[A] motion to dismiss under rule 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)); *accord IberiaBank Corp.*, 953 F.3d at 345; *Leal*, 731 F.3d at 410. "The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000); *accord Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) (noting that at the 12(b)(6) stage the court's task "is to determine whether the plaintiff [has] stated a legally cognizable claim that is plausible, not

19

to evaluate the plaintiff's likelihood of success"); *Leal*, 731 F.3d at 410.   "In other words, a motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.'"   *Ramming*, 281 F.3d at 161-62 (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1137 (5th Cir. 1992)); *accord Yazdi v. Lafayette Par. Sch. Bd.*, No. 6:18-CV-00510, 2020 WL 5876703, at *2 (W.D. La. Sept. 30, 2020); *Lopez-Flores v. Ibarra*, No. 1:17-CV-00105, 2018 WL 6577955, at *2 (S.D. Tex. Mar. 12, 2018).

A Rule 12(b)(6) motion to dismiss must be read in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure.   *Twombly*, 550 U.S. at 555.   Accordingly, a district court should not dismiss a complaint for failure to state a claim unless a plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face."   *Id.* at 570; *accord King*, 46 F.4th at 355; *IberiaBank Corp.*, 953 F.3d at 345 (quoting *Iqbal*, 556 U.S. at 678); *Zastrow v. Hous. Auto Imps. Greenway Ltd.*, 789 F.3d 553, 559 (5th Cir. 2015); *Leal*, 731 F.3d at 410; *Wilson*, 667 F.3d at 595.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Coleman v. Sweetin*, 745 F.3d 756, 763 (5th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678); *accord King*, 46 F.4th at 355-56; *Thompson*, 764 F.3d at 503; *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."   *Walker*, 938 F.3d at 735 (quoting *Iqbal*, 556 U.S. at 678); *accord King*, 46 F.4th at 356.   "Factual allegations that are 'merely consistent with a defendant's liability, stop short of the line between possibility and plausibility

of entitlement to relief,' and thus are inadequate." *Walker*, 938 F.3d at 735.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Shaw v. Villanueva*, 918 F.3d 414, 415 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678); *accord King*, 46 F.4th at 356 ("[C]ourts 'do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.'" (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005))); *Gibson v. Tex. Dep't of Ins.–Div. of Workers' Comp.*, 700 F.3d 227, 233 (5th Cir. 2012). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *Shaw*, 918 F.3d at 419.

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679; *Shaw*, 918 F.3d at 419; *Collins v. Robinson Indep. Sch. Dist.*, No. W-21-CV-00657, 2022 WL 2019294, at *1 (W.D. Tex. June 6, 2022).  In other words, to state a cognizable cause of action, the complaint must allege sufficient facts to "nudge" the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *Leal*, 731 F.3d at 410; *see Walker*, 938 F.3d at 734 (quoting *Grubbs*, 565 F.3d at 186). Generally, at the 12(b)(6) stage, a plaintiff is simply required to inform the defendant of the factual basis of his complaint in order to avoid dismissal for failure to state a claim.  *See Johnson v. City of Shelby*, 574 U.S. 10, 11-12 (2014) (citing Fed. R. Civ. P. 8(a)(2)); *Groden v. City of Dallas*, 826 F.3d 280, 283 (5th Cir. 2016).

B.   Title VII Claims

Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see Bostock v. Clayton County*, ___ U.S. ___, 140 S. Ct. 1731, 1738 (2020); *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 531 (2015); *Equal Emp. Opportunity Comm'n v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013); *Vance v. Ball State Univ.*, 570 U.S. 421, 426 (2013). "The purposes of Title VII are to achieve equality of employment opportunity and to make persons whole for injuries suffered on account of unlawful employment discrimination." *Floca v. Homcare Health Servs., Inc.*, 845 F.2d 108, 111 (5th Cir. 1988) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975)); *see Nassar*, 570 U.S. at 342; *Equal Emp. Opportunity Comm'n v. First Metro. Fin. Serv., Inc.*, 449 F. Supp. 3d 638, 646 (N.D. Miss. 2020).

        1.    <u>Disparate Treatment</u>[8]

Employment discrimination cases are not subject to a heightened pleading standard. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002); *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 767-68 (5th Cir. 2019); *Briceno-Belmontes v. Coastal Bend Coll.*, No. 2:20-CV-00114, 2022 WL 673854, at *4 (S.D. Tex. Mar. 5, 2022). The Supreme Court has made it clear that a plaintiff in an employment discrimination case need not plead a *prima facie* case in his complaint. *See Swierkiewicz*, 534 U.S. at 508; *see also Wright v. Union Pac. R.R.*

---

[8] In the Partial Motion to Dismiss, LIT states Pfang variously refers to his claims as being for race, national origin, and ethnicity discrimination, harassment, and retaliation. For simplicity's sake, LIT refers to the claims as alleging race discrimination, race-based harassment, and race-based retaliation. Pfang, in his Response, adopts the use of the term race to include all three. The court will do the same.

*Co.*, 990 F.3d 428, 433 (5th Cir. 2021); *Cicalese*, 924 F.3d at 766 (quoting *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013)).   "Rather, a plaintiff need only follow Rule 8's command that a complaint contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Hernandez v. Rotorcraft Servs. Grp., Inc.*, No. 4:21-cv-00392-O, 2021 WL 3812158, at *4 (N.D. Tex. June 22, 2021) (quoting FED. R. CIV. P. 8(a)(2)).   "Rule 8 thus sets out a 'low bar' to evaluate the sufficiency of a claim, requiring only that a plaintiff's pleadings 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  *Taylor v. S. LA Contractors, LLC*, No. 6:22-0217, 2022 WL 16570086, at *3-4 (W.D. La. Sept. 30, 2022) (quoting *Gilbert v. Outback Steakhouse of Fla. Inc.*, 295 F. App'x 710, 713 (5th Cir. 2008)), *adopted by* No. 6:22-0217, 2022 WL 16558732 (W.D. La. Oct. 31, 2022); *see Bell Atl. Corp.*, 550 U.S. at 555 (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 309 (5th Cir. 2021) (quoting *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 498 (5th Cir. 2015)).  So long as a pleading alleges facts upon which relief can be granted, it states a claim even if it "fails to categorize correctly the legal theory giving rise to the claim."  *Sanchez Oil & Gas Corp.*, 7 F.4th at 309 (quoting *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 402 (5th Cir. 2013)).

Rule 8 reflects the basic philosophy of the Federal Rules that "simplicity, flexibility, and the absence of legalistic technicality are the touchstones of a good procedural system."  5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1217 (4th ed. 2014).  At the pleading stage, Pfang need only "plead sufficient facts on all of the *ultimate elements* of a disparate treatment claim to make her [his] case plausible."  *Cicalese*, 924 F.3d at 766 (quoting *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 470 (5th Cir. 2016) (emphasis

23

added), *cert. denied*, 137 S. Ct. 1339 (2017)).  The United States Court of Appeals for the Fifth Circuit has identified the "two ultimate elements a plaintiff must plead to support a disparate treatment claim under Title VII:  (1) 'an adverse employment action,' (2) taken against a plaintiff 'because of [his] protected status.'"  *Id.* at 767 (quoting *Raj*, 714 F.3d at 331).

Where a plaintiff's employment discrimination claim relies on circumstantial evidence, however, "it can be 'helpful to reference' [the *McDonnell Douglas*] framework when the court is determining whether a plaintiff has plausibly alleged the ultimate elements of the disparate treatment claim."  *Id.* (quoting *Chhim*, 836 F.3d at 470-71).  Of course, the *McDonnell Douglas* framework is an "evidentiary standard, not a rigid pleading requirement."  *Hernandez*, 2021 WL 3812158, at *4 (quoting *Puente v. Ridge*, 324 F. App'x 423, 427 (5th Cir. 2009)).  Nevertheless, courts have recently dismissed claims on the grounds that they could not plausibly support one or more elements of a *prima facie* case under Title VII.  *See, e.g.*, *Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595, 600 (5th Cir.) (affirming the district court's dismissal of a Title VII claim where the plaintiff "failed to plead any facts indicating less favorable treatment than others 'similarly situated' outside of the asserted protected class" and did not provide "any facts about any comparators at all"), *cert. denied*, 142 S. Ct. 713 (2021); *Gaumond v. City of Dallas*, No. 3:21-CV-00624-E, 2023 WL 2061170, at *4 (N.D. Tex. Feb. 15, 2023) (dismissing the plaintiff's Title VII claims because he failed to specify a protected class and did not identify a comparator employee); *Johnson v. Fed. Info. Sys.*, SA-22-CV-00796-XR, 2022 WL 4298458, at *6-7 (W.D. Tex. Sept. 16, 2022) (concluding that the plaintiff's Title VII claims should be dismissed because she neither identified a comparator employee nor alleged that she was replaced by someone outside of her race or sex).

In other instances, courts have been wary to dismiss the action at the pleading stage.  *See Cicalese*, 924 F.3d at 768 (vacating the district court's grant of a motion to dismiss because the court had "erred by holding [the plaintiffs] to a heightened pleading standard" in part by "scrutinizing whether [the plaintiffs'] fellow employees were really 'similarly situated'"); *Thompson*, 764 F.3d at 506 ("[F]urther assessment of [the plaintiff's] claim is fact-intensive and better suited for the summary-judgment or trial stage."); *Lucenio v. Hous. Indep. Sch. Dist.*, No. 4:21-cv-00650, 2022 WL 658838, at *15 (S.D. Tex. Feb. 16, 2022) ("[S]crutinizing whether [the plaintiff's] white co-workers were truly 'similarly situated' to her is more suited for the summary judgment phase." (citing *Cicalese*, 924 F.3d at 768)), *adopted by* No. 4:21-cv-00650, 2022 WL 658719 (S.D. Tex. Mar. 4, 2022).

Here, LIT argues that, even accepting Pfang's allegations as true, he cannot possibly recover on his Title VII discrimination claims because he "fails entirely to plead any facts at all, much less ones sufficient to make his Title VII discrimination claim plausible, addressing prong four of that claim—that is, that 'he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.'"  The court is not convinced that dismissal is proper on the ground that Pfang has failed to allege he is similarly situated to an employee of a different race, who was treated more favorably.  As outlined above, Pfang was a Vice President and a member of the President's Executive Team, supervised by both Howard and Hill.  The comparators he alleges are (1) Gonzales, also a Vice President/CFO and member of the President's Executive Team, who was supervised by both Howard and Hill, and (2) Prince, while formally designated as Pfang's subordinate, was allegedly treated by leadership as Pfang's equal, if not his

superior, who was also supervised by both Howard and Hill.  Pfang alleges both employees committed infractions that were at least as serious, if not worse, than those allegedly committed by Pfang, yet neither was disciplined nor terminated.  Pfang alleges that Gonzales is Hispanic and Prince is African American, while Pfang is Asian.  In his complaint to Human Resources, Pfang specifically alleges he was discriminated against based on his race and ethnicity.  In light of these allegations, and given the intense factual inquiry required to determine whether employees are similarly situated, the court declines to dismiss Pfang's Title VII claim alleging disparate treatment.  *See Cicalese*, 924 F.3d at 768 ("The court's analysis of the complaint's allegations—scrutinizing whether Appellants' fellow employees were really 'similarly situated' and whether Jacobs's and Tyler's derogatory statements about Italians amount to 'stray remarks'—was more suited to the summary judgment phase.").

2.   <u>Harassment/Hostile Work Environment</u>

"A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)); *see also Hudson v. Lincare, Inc.*, 58 F.4th 222, 229 (5th Cir. 2023).  To establish a *prima facie* case of a racially hostile work environment based on the actions of a supervisor with immediate or successively higher authority over the employee, a plaintiff must show that:

(1)     he belongs to a protected class;

(2)     he was subject to unwelcome harassment;

26

(3)      the harassment was based on race; and

(4)      the harassment affected a term, condition, or privilege of employment.

*See Johnson v. PRIDE Indus., Inc.,* 7 F.4th 392, 399-400 (5th Cir. 2021); *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 650 (5th Cir. 2012); *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003); *Celestine v. Petroleos De Venezuella SA*, 266 F.3d 343, 353-54 (5th Cir. 2001); *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).  When a supervisory employee is involved, once the plaintiff satisfies these four elements, an "employer is subject to vicarious liability to a victimized employee." *Watts*, 170 F.3d at 509 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)); *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764 (1998); *Ackel v. Nat'l Comm., Inc.*, 339 F.3d 376, 383 (5th Cir. 2003).[9]  With respect to allegations of racial harassment committed by a co-worker, the plaintiff must also satisfy a fifth element, "that the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Watts*, 170 F.3d at 509 n.3 (citing *Williamson v. City of Houston*, 148 F.3d 462, 464 (5th Cir. 1998)); *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir.), *cert. denied*, 528 U.S. 963 (1999).

To affect a term, condition, or privilege of employment, "the work environment must be 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Allen v. Our Lady of the Lake Hospital, Inc.*, No. 22-30546, 2023 WL 3267840, *3 (5th Cir. May 5, 2023) (quoting *Hernandez,*

_____

[9] Although the Supreme Court's decisions in *Faragher* and *Ellerth* deal with claims of sexual harassment, their reasoning is equally applicable to claims of racial harassment.  *See Walker v. Thompson*, 214 F.3d 615, 626 n.13 (5th Cir. 2000); *Allen v. Mich. Dep't of Corrections*, 165 F.3d 405, 411 (6th Cir. 1999); *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1269 (10th Cir. 1998).

670 F.3d at 651 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1988)); *see also Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007). "In determining whether an environment is hostile or abusive, the court must look to the totality of the circumstances." *Lauderdale*, 512 F.3d at 153.  Factors to consider in determining whether a particular work environment is hostile are: (1) the frequency of the discriminatory conduct; (2) the severity of the discriminatory conduct; (3) whether the conduct is physically threatening or humiliating, or merely an offensive utterance; and (4) whether the conduct interferes with the employee's work performance.  *Allen*, 2023 WL 3267840, *3 (citing *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005)); *see also E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007).

As noted above, "a plaintiff need not make out a *prima facie* case of discrimination in order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Whitlock v. Lazer Spot, Inc.*, 657 F. App'x 284, 286 (5th Cir. 2016) (citing *Raj*, 714 F.3d at 331) (racially motivated hostile work environment and discriminatory discharge context).  Pfang is not required to plead facts that support all the elements of his Title VII claim; he only needs to plead the "ultimate elements" of the claim.  *See Cicalese*, 924 F.3d at 767; *see also Golden v. McDonough*, No. 1:21-cv-129-TBM-RHWR, 2022 WL 1714485, at *3  (S.D. Miss. Mar. 29, 2022).  The ultimate elements of a hostile work environment claim are ". . . an employer has created a 'working environment heavily charged with . . . discrimination.'" *Golden*, 2022 WL 1714485, at *3 (citing *Raj*, 714 F.3d at 330–31) (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971) (superseded by statute on other grounds))).  Finally, Pfang's allegations, when taken as true, must be sufficient to allow the court to draw a reasonable inference that LIT could be liable for the

misconduct alleged.  *Coleman*, 745 F.3d at 763 (quoting *Iqbal*, 556 U.S. at 678); *accord King*, 46 F.4th at 355-56; *Thompson*, 764 F.3d at 503; *Harold H. Huggins Realty, Inc.*, 634 F.3d at 796.

Here, LIT argues that Pfang has not pleaded all the necessary elements of his hostile-work-environment claim.  Specifically, LIT contends that the incidents Pfang relies upon to support this claim do not reflect a "racial motive."  Viewing the facts alleged in the light most favorable to Pfang, and considering the totality of the circumstances as alleged, the court finds Plaintiff has sufficiently pleaded a claim for hostile work environment.

Pfang avers that the harassment was conducted by Howard, Hill, and Prince, all African American, over his entire tenure at LIT, albeit a short one, and that he is Asian.  First, Plaintiff refers to an April 1, 2022, meeting wherein Howard asked Pfang to come to his office.  Pfang was given no prior notice of the meeting and discovered Hill, Gonzales, Prince and Parker-Williams were also in attendance.  During this meeting, Pfang alleges Howard allowed Prince, Pfang's subordinate, to criticize him openly for mishandling the meeting with the Beaumont Regional Airport representatives.  Howard permitted Prince to tell Pfang and the others present that Pfang did not know how to deal with community business leaders.  As alleged by Pfang, Prince had little involvement in the airport meetings and was not in charge of developing new programs.  Pfang alleges that during the same meeting, Howard also commented and criticized him while reading from various emails on which Pfang had not been copied.  Pfang alleges the emails appeared to be from Prince to Howard.  Pfang specifically contends that he felt no support from Howard in this meeting and was humiliated.

29

Pfang next alleges that in a meeting around April 4, 2022, with Howard, Hill, Gonzales, and possibly others present, Howard made remarks about the airplane maintenance program. Howard commented publicly to the group that it came together quickly and that Pfang mismanaged its development.  Pfang next describes how Howard then polled the individuals in attendance about their opinion, seeking their public comment on how Pfang handled the program, questioning each one individually while Pfang was forced to listen.  Pfang states that after hearing what he wanted, Howard dismissed him from the meeting, while asking Hill and Gonzales to stay behind.

Pfang also complains about the April 12, 2022, incident in which Hill issued Pfang a verbal warning for his purported "mismanagement of the aviation program proposal to external stakeholders."  Hill told Pfang the verbal warning included his failure to keep her informed of "potential external opportunities and meetings prior to confirming LIT's participation."  Pfang states the accusations were not accurate but, regardless, the verbal warning was followed up by an email, all after Hill refused to permit Pfang to give Prince, his subordinate, a verbal warning for being disrespectful and failing to follow Pfang's instructions.  Pfang informed Hill of his opinion that her discipline of him, as an Asian immigrant, was "unjust and inappropriate," in contrast to her interference in preventing Pfang from disciplining Prince, an African American non-immigrant.  In light of his concerns, Pfang filed a grievance with the Human Resources Department complaining of racial discrimination and requested that the Chancellor's office conduct an independent investigation.[10]

---

[10] As previously stated, Pfang told Hill, ". . . in view of you and Dr. Howard's being of the same race as Dr. Prince, I request this matter be referred to the Chancellor's Office to be investigated fairly, without racial prejudice."

Finally, after Pfang filed the grievance, Hill began her alleged retaliatory investigation into Pfang regarding his lack of timely communication with her regarding the LIT vehicle accident. This investigation consisted of emails to Pfang making inquiries regarding his communication, an April 14, 2022, meeting held with Pfang and others to get an "overview" of the accident, followed by several other meetings held by Hill, with others present, to determine whether Pfang gave her notice.   Although the investigation resulted in the discovery that Gonzales failed to obtain insurance for any of the LIT drivers, it was Pfang who was ultimately terminated.

Although it is a close call, looking to the totality of the circumstances, the court finds that Pfang has plausibly alleged a claim for hostile work environment.  The allegation of a coordinated effort by Howard, Hill, and Prince, all African American, to harass and publicly humiliate Pfang, the only Asian, may give rise a reasonable inference that the conduct was based on race.  This is supported by Plaintiff's contemporaneous grievance to the Human Resources Department and his request that the Chancellor's Office conduct an independent investigation due to his concerns about racial discrimination and harassment.  Again, "[t]he issue is not whether [Pfang] will ultimately prevail, but whether [he is] entitled to offer evidence to support [his] claim." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007).

III.     Conclusion

Consistent with the foregoing analysis, LIT's Motion to Dismiss for Failure to State a Claim (#6) is DENIED.

SIGNED at Beaumont, Texas, this 5th day of August, 2023.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE