| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |

| RAYMOND PFANG, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 1:23-CV-93 |
| | § | |
| LAMAR INSTITUTE OF TECHNOLOGY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the court is Defendant Lamar Institute of Technology's ("LIT") Motion for Summary Judgment (#39). Plaintiff Raymond Pfang ("Pfang") filed a response to LIT's motion (#47), LIT filed a reply (#48), and Pfang filed a sur-reply (#49). On April 22, 2025, the court ordered LIT to amend its motion for summary judgment to reflect the proper citations to the summary judgment evidence in compliance with Local Rule CV-56(d) (#52). LIT was admonished that the only changes to be made to the amended motion for summary judgment were to the citations to the summary judgment evidence. LIT filed its Amended Motion for Summary Judgment on May 2, 2025 (#53). Pfang filed his Amended Response in Opposition (#54), and LIT filed a sur-reply (#55). Having considered the motions, the submissions of the parties, the record, and the applicable law, the court is of the opinion that LIT's amended motion should be granted in part and denied in part.

I.    Background[1]

Pfang is of Chinese descent and is a naturalized citizen of the United States. Pfang's education includes an M.B.A. from the University of Greenwich, in London, England, and a

_____

[1] Pfang's First Amended Complaint is the operative pleading (#29).

Ph.D. in Management from the University of Surrey Business School, in Guildford, England. Prior to his employment with LIT, Pfang worked in various administrative positions with Tarrant County College, in Fort Worth, Texas, and Palo Alto College, in San Antonio, Texas, from 2013 to 2021. These positions included Dean, Assistant Dean, and Assistant to the President. Prior to his immigration to the United States in 2011, Pfang was employed as the Director of Operations for Infocheck Ltd, UK, the founding CEO of NES Healthcare, UK, and later the Program Director for the M.A. program in Global Management, Senior Lecturer, and Director for Regents Business Forum, at Regent's University Business School in London.

Pfang applied for a position with LIT on October 29, 2021, as the Associate Vice President ("AVP") of Education Support and Special Assistant to the President. Dr. Lonnie Howard ("Howard"), the former President of LIT, hired Pfang on November 15, 2021. When accepting the offered position, Pfang understood that he would also be a member of Howard's "executive team" working with Howard and other LIT administrators. Pfang alleges that during the interview process, Howard told him that he would mentor Pfang in his desire to become a president of a college or university, as he had successfully mentored three other individuals in reaching the same goal. Pfang officially began his employment with LIT on December 1, 2021, and he was terminated from employment on April 21, 2022.

Within a few days of his employment with LIT, the AVP for Workforce and Strategic Initiatives unexpectedly resigned from her position. Pfang alleges that Howard asked him to oversee the duties of the former AVP on a temporary basis until a replacement could be hired. Pfang led the search and developed a short list of candidates for Howard's consideration. Howard, however, ultimately ceased the search and decided not to fill the position, asking Pfang

to take over the duties of the position. Pfang complied with Howard's request and formally took over that role in January 2022. Pfang's responsibilities as AVP of Education Support, Special Assistant to the President, and AVP of Workforce and Strategic Initiatives required him to oversee several departments. These include Marketing, Institutional Effectiveness, Assessment and Research, Grants, New Program Development, the LIT Foundation, LIT's professional truck driver training program, and the staff associated with those departments. Pfang alleges he received no additional pay for assuming the new duties and despite requests for additional help, he received none. Also, shortly after Pfang began his employment with LIT, Howard asked Pfang to reorganize the administrative structure of the LIT campus from top to bottom. After several weeks of consulting with other executive team members and certain LIT staff, Pfang provided Howard with his proposal, which included a written explanation of the reasons for his proposed realignment.

Near the end of Pfang's reorganization project, Dr. Byron Prince ("Prince"), who was one of Pfang's direct reports and subordinates, told Pfang that Howard had asked Prince to prepare a proposed reorganization chart of the Workforce and Strategic Initiatives department, showing himself as AVP. Pfang was surprised because Pfang was the current AVP of Workforce and Strategic Initiatives and Howard knew that, under Pfang's reorganization proposal, Pfang would remain in that position. Although Pfang ultimately continued in the position, Pfang contends that this was the first instance in which his authority as Prince's supervisor was undermined by Howard. Both Prince and Howard are African American.

On or about February 15, 2022, Howard named Dr. Angela Hill ("Hill") as LIT's Vice President ("VP") of Instruction and Provost. Hill, too, is African American. According to Pfang, she had far less experience to serve in these positions as compared to Pfang. After Hill's appointment, Howard informed Pfang that he would now report directly to Hill. At the same time, all other members of Howard's executive team also began reporting directly to Hill, with the exception of Rudy Gonzales ("Gonzales"), who was the VP of Finance and Operations and the Chief Financial Officer ("CFO"). The members of Howard's executive team were: Hill, Pfang, Gonzales, Veronica Garcia ("Garcia"), Ken Mason ("Mason"), and Andrea Stephenson ("Stephenson").[2] According to Pfang, Gonzales and Garcia are Hispanic while Mason and Stephenson are Caucasian. Shortly after Howard appointed Hill as Provost, Howard informed his executive team that he was retiring as President of LIT effective at the end of 2022.

Pfang's First Amended Complaint goes on to describe his interactions with various members of Howard's executive team, including Howard, during his short tenure with LIT, which he alleges support his claim of employment discrimination. Generally, Pfang alleges the following with respect to these interactions:

1.    Shortly after Pfang was hired by Howard, Pfang was given an additional portfolio of departments and areas for which he was responsible. Pfang welcomed the additional responsibility, but he soon learned that his authority to oversee the new responsibilities was being denigrated by Howard, Hill, and Prince.

2.    Within a couple of months of being hired, Howard began to make disparaging and critical comments about Pfang in meetings with Pfang and other executive team members and staff.

---

[2] Pfang does not identify Mason and Stephenson's roles. Pfang lists Garcia as an AVP but does not identify the department she served.

4

3.      Howard viewed Prince, Pfang's subordinate, as Pfang's equal, and at times, Howard and Hill treated Prince as if Prince were Pfang's supervisor.

4.      Howard allowed Prince to be openly critical, dismissive, and insulting of Pfang in meetings with Pfang, Pfang's superiors, and colleagues.  Pfang alleges both Howard and Hill adopted Prince's criticisms of Pfang, using the criticisms to discipline him for alleged poor performance with respect to the aviation project.

5.      Howard and Hill retaliated against Pfang when he notified Hill and Beth Knape ("Knape"), Human Resources Director, of his complaints regarding discrimination.  Pfang alleges that he had tried to discipline Prince for his inappropriate behavior and refusal to follow Pfang's direction, but Hill refused to allow Pfang to do so.

6.      Shortly after notifying Hill and Knape of his grievances regarding discrimination, Hill and Howard began an "investigation" that Pfang alleges was actually a campaign of harassment and retaliation which, along with other actions by Howard, Hill, and Prince, created a hostile work environment and ultimately resulted in Pfang's termination, purportedly related to an LIT vehicle accident, which Pfang alleges was a pretext to discharge him.[3]

7.      Despite Pfang telling Hill on April 14, 2022, that he did not recall directly informing Hill of the accident and that he would do so in the future, Hill asked Pfang to create a timeline of events surrounding the accident to show who knew of the incident and who had informed their supervisors.  In addition, Hill organized additional meetings to determine when certain supervisors were informed of the accident.

8.      This "investigation" conducted by Hill and Howard lasted for a number of days.  According to Pfang, if Hill believed the incident where he failed to "timely" inform her of the accident was a fireable offense, Hill could have terminated Pfang on April 15, 2022.  Instead, Hill and Howard continued to conduct their investigation, further retaliating, harassing, and humiliating Pfang, which created a hostile work environment, before Pfang was ultimately terminated.  Pfang, again, alleges that his failure to "timely" notify Hill of the accident was a mere pretext and was in retaliation for filing a grievance against Hill.

_____

[3] According to Pfang, Hill and Howard alleged he failed to report an LIT vehicle accident to Hill, his direct supervisor.

9.      Pfang alleges that Prince, Hill, and Gonzales, all non-Asian, not of Chinese national origin, and not immigrants, are comparators.  Prince, an African American, was treated as an equal, if not as Pfang's superior, by Howard and Hill, both also African American.  Prince received preferential treatment as compared to Pfang under similar circumstances with respect to discipline when Hill would not allow Pfang to discipline Prince.  Pfang contends that Hill also received preferential treatment as compared to Pfang under similar circumstances with regard to her being permitted to discipline a direct report while he was not allowed to discipline Prince.  Although she disciplined Pfang.  Pfang states that Gonzales, a Hispanic male, received preferential treatment when he was not disciplined under similar circumstances as a member of Howard's executive team.  Gonzales himself failed to report the vehicle accident to Howard and, more importantly, failed to obtain insurance for LIT's truck-driving instructors and students, as compared to Pfang's immaterial lapse of failing to timely report the accident to Hill.

10.     Pfang finally alleges that LIT's allegations of "poor performance" were a pretext for its wrongful discriminatory conduct against him.  Pfang contends his allegations of pretext are supported by the fact that LIT failed to follow its own policies regarding termination and investigation of complaints of discrimination.  LIT's policies required that Pfang be given a hearing in connection with his proposed termination.  Instead, LIT terminated Pfang less than 10 days after his complaints of discrimination in retaliation for making this complaint.  Knape was not even aware that Hill had terminated Pfang until Pfang told her he was terminated.

Upon his termination, Pfang filed a charge of employment discrimination against LIT on May 19, 2022, with the Texas Workforce Commission Civil Rights Division and the Equal Employment Opportunity Commission, in which he asserted that he was treated in a disparate and discriminatory manner due to his race and national origin, and he was harassed and retaliated against by LIT for asserting his rights.  Pfang ultimately received a right to sue letter on December 19, 2022.  In this suit, Pfang asserts claims of unlawful discrimination against him based on his race, national original, and ethnicity, retaliation, and subjection to a hostile work environment/harassment under Section 703(a) of Title VII of the Civil Rights Act of 1964 ("Title

VII"), 41 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e-3(a).  For relief, Pfang seeks monetary damages, attorneys' fees, costs, and interest.

II.    Analysis

    A.    Motion for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Union Pac. R.R. Co. v. Palestine*, 41 F.4th 696, 703 (5th Cir.), *cert. denied*, 143 S. Ct. 579 (2023); *United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Anderson*, 9 F.4th 328, 331 (5th Cir. 2021); *Smith v. Harris County*, 956 F.3d 311, 316 (5th Cir. 2020); *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022); *Goldring v. United States*, 15 F.4th 639, 644-45 (5th Cir. 2021); *Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 416-17 (5th Cir. 2021); *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019).  To warrant judgment in his favor, the movant "must establish beyond peradventure *all* of the essential elements of the claim or defense." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020) (quoting *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017)); *accord Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011).

7

"A fact issue is 'material' if its resolution could affect the outcome of the action." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015) (quoting *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)); *see MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp.*, 7 F.4th 315, 321 (5th Cir. 2021); *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020). "Factual disputes that are irrelevant or unnecessary will not be counted." *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *accord Valencia v. Davis*, 836 F. App'x 292, 296 (5th Cir. 2020); *see Dyer*, 964 F.3d at 379. "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Gerhart v. Barnes*, 724 F. App'x 316, 321 (5th Cir. 2018) (quoting *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)); *accord Johnson v. City of San Antonio*, No. 22-50196, 2023 WL 3019686, at *6 n.7 (5th Cir. Apr. 20, 2023); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019). Thus, "[a] genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368 (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)); *Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 309 (5th Cir. 2021); *Dyer*, 964 F.3d at 379; *Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016). The moving party, however, "need not negate the elements of the nonmovant's['] case." *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014); *see Savoy v. Kroger Co.*, 848 F. App'x 158, 160 (5th Cir. 2021).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3; *see Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting FED. R. CIV. P. 56(e)); *Flowers v. Wal-Mart Inc.*, 79 F.4th 449, 452 (5th Cir. 2023); *MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Acadian Diagnostic Lab'ys, L.L.C. v. Quality Toxicology, L.L.C.*, 965 F.3d 404, 410 (5th Cir. 2020). The court "should review the record as a whole." *Black v. Pan Am. Lab'ys, L.L.C.*, 646 F.3d 254, 273 (5th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)); *see Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018); *City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150; *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 476 (5th Cir. 2022); *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021); *Lyons*, 964 F.3d at 302. The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in his favor. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson*, 477 U.S. at 255); *Seigler*, 30 F.4th at 476; *Batyukova*, 994 F.3d at 724; *Lyons*, 964 F.3d at 302.

Furthermore, the court's obligation to draw reasonable inferences "does not extend so far as to allow a wholly 'unreasonable inference' or one which amounts to 'mere speculation and conjecture.'" *Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984) (quoting *Bridges v. Groendyke Transp., Inc.*, 553 F.2d 877, 879 (5th Cir. 1977)); *accord McGill v. BP Expl. & Prod., Inc.*, 830 F. App'x 430, 432 (5th Cir. 2020); *Batyukova*, 994 F.3d at 724 ("'Conclusory

allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation' will not survive summary judgment." (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016))); *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 528 (5th Cir. 1999) ("If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69 (1992))); *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 779 (E.D. Tex. 2008) ("[O]nly reasonable inferences in favor of the nonmoving party can be drawn from the evidence." (citing *Eastman Kodak Co.*, 504 U.S. at 468 n.14)). "[S]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 256 (5th Cir. 2020) (quoting *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)); *accord Allaudin v. Perry's Rests., Ltd.*, 805 F. App'x 297, 299 (5th Cir. 2020); *Acadian Diagnostic Lab'ys*, L.L.C., 965 F.3d at 410 (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Summary judgment is generally inappropriate, however, when inferences the parties seek to draw deal with questions of motive and intent. *Autobahn Imps., L.P. v. Jaguar Land Rover N. Am., L.L.C.*, 896 F.3d 340, 350 n.23 (5th Cir. 2018); *see Perry v. H.J. Heinz Co. Brands, L.L.C.*, 994 F.3d 466, 476 (5th Cir. 2021) ("[S]ummary judgment is rarely proper when an issue of intent is involved." (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996))); *United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) (stating that "we hesitate to grant summary judgment when a case turns on a state of mind determination");

*Pasco v. Knoblauch*, 223 F. App'x 319, 322 (5th Cir. 2007) ("[S]ummary judgment is rarely proper when an issue of intent is involved.").  Courts have applied this principle when denying summary judgment to defendants in employment discrimination cases where genuine disputes of material fact exist as to whether the plaintiff was discriminated against on the basis of his or her protected class.  *See, e.g.*, *Cappel v. La. Dep't of Transp. & Dev.*, No. 10-1810, 2012 WL 2990695, at *2 (E.D. La. July 20, 2012) (denying the defendant's motion for summary judgment on the plaintiff's age, race, and sex discrimination claims in part because "where the Defendant's intent is at issue, it is inappropriate '[t]o grant summary judgment because the party's state of mind is inherently a question of fact which turns on credibility'" (quoting *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991))); *see also Whatley v. Hopewell*, No. 1:21-CV-01185, 2022 WL 11385995, at *9 & n.27 (W.D. La. Oct. 19, 2022).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *Lyons*, 964 F.3d at 302; *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 560 (5th Cir. 2019).  "[W]here the non-moving party fails to establish 'the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' no genuine issue of material fact can exist." *Goode v. Greenstream Int'l, L.L.C.*, 751 F. App'x 518, 521 (5th Cir. 2018) (quoting *Nichols v. Enterasys Networks, Inc.*, 595 F.3d 185, 188 (5th Cir. 2007)); *see Phillips v. Sanofi U.S. Servs. (In re Taxotere (Docetaxel) Prods. Liab. Litig.)*, 994 F.3d 704, 710 (5th Cir. 2021).

In such a situation, "'[a] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial' and 'mandates the entry of summary judgment' for the moving party." *Alvarez v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (quoting *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008)); *accord Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 750 (5th Cir. 2023); *Stingley v. Watson Quality Ford*, 836 F. App'x 286, 288 (5th Cir. 2020).

  B. <u>Objections to Summary Judgment Evidence</u>

  Pfang objects to two specific portions of LIT's summary judgment evidence.  Specifically, Pfang argues that portions of Hill's declaration and Prince's email rely on inadmissible hearsay. A party may object to materials offered as summary judgment evidence when the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. FED. R. CIV. P. 56(c)(2); *Klocke v. Watson*, No. 20-10103, 2021 WL 5871884, at *15 (5th Cir. Dec. 10, 2021); *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).  In evaluating admissibility, summary judgment evidence is subject to the same standards and rules that govern the admissibility of evidence at trial.  *In Re Matter of Highland Cap. Mgmt., L.P.*, 116 F.4th 422, 420 (5th Cir. 2024).  If an objection is sustained, the court disregards only those portions of the evidence that contain objectionable material while considering the content that remains.  *Garza-Flores v. Mayorkas*, 38 F.4th 440, 445 (5th Cir. 2022) (citing *Akin v. Q-L Invs., Inc.*, 959 F.2d 521, 531 (5th Cir. 1992)).

Under the Federal Rules of Evidence, hearsay, defined as any statement not made by a person while testifying in the current trial or hearing and that is offered to prove the truth of the matter asserted, is generally inadmissible. FED. R. EVID. 801(c), 802. Any statement made by an outside party to a third party in contact with the declarant and subsequently communicated to the declarant by the third party is hearsay within hearsay, and is inadmissible unless the party offering the statement can establish that a second hearsay exception applies. *See* FED. R. EVID. 805.

Statements offered for another reason, such as showing notice or the effect on the listener, however, are not hearsay. *See United States v. Reed*, 908 F.3d 102, 120 (5th Cir. 2018); *Coleman v. Jason Pharm.*, 540 F. App'x 302, 306 (5th Cir. 2013); *Brauninger v. Motes*, 260 F. App'x 634, 637 (5th Cir. 2007). Moreover, a statement subject to the general hearsay rule is excluded from hearsay when it is "offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." FED. R. EVID. 801(d)(2)(D); *accord Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 966-67 (5th Cir. 2016). To qualify as a hearsay exclusion, "the proponent of the statement must show, through evidence independent of the proffered statement, that (1) there existed an employment relationship between the declarant and the party, (2) the statement was made during the agency or employment relationship[,] and (3) the statement concerned a matter within the declarant's scope of employment." *See Lay v. Singing River Health Sys.*, 694 F. App'x 248, 256 (5th Cir. 2017); *Kelly ex rel. all Heirs at Law of Kelly v. Labouisse*, No. 3:07CV631TSL-JCS, 2009 WL 427103, at *3 (S.D. Miss. Feb. 19, 2009), *aff'd sub nom. Kelly v. Labouisse*, 364 F. App'x 895 (5th Cir. 2010).

1.    Hill's Declaration (Exhibit 18)

Pfang objects to paragraphs 7 and 11 of Hill's declaration on the grounds that the statements contained therein are based on hearsay rather than personal knowledge.  In paragraphs 7 and 11 of Hill's declaration, she states:

> 7.  Later that day, following a campus tour, which Dr. Pfang coordinated with the City Manager and the Municipal Airport Manager, the guests spoke with Dr. Howard and commented to him their interest and excitement in the upcoming aviation program.  During that meeting **I learned** that Dr. Pfang had already had discussions with the external stakeholders about lease agreements and costs associated with the aviation program, which signaled that the relationship and discussions had gone further than authorized.  This was a clear signal that Dr. Pfang had disregarded the previous instructions given to him to slow down and that Dr. Pfang had overstepped his authority.  **When I asked Dr. Pfang if he had engaged in discussions with the external stakeholders about lease agreements and costs, he admitted that he had.**
>
> ***
>
> 11. During this same period, **I was made aware** of some concerns that one of Dr. Pfang's reports had about Dr. Pfang's leadership and management of the Workforce and Strategic Initiatives.  Among other concerns, Dr. Prince indicated that Dr. Pfang was miscommunicating and creating friction and confusion.

Pfang urges the court to disregard Hill's statements where she states she "learned" or "was made aware" of concerns regarding Pfang.  Pfang argues these statements are not based on personal knowledge, are not credible, and are put forth for no other reason than to attempt to prove the truth of the matter asserted.  LIT argues these statements are not hearsay and are offered to show their effect on the listener, Dr. Hill.  LIT states specifically that these statements are not being offered to show that Pfang actually discussed lease agreements and costs associated with the aviation program or that Pfang was actually miscommunicating and creating friction and

14

confusion.  Instead, LIT maintains that they are being offered to show how these statements affected Hill and contributed to her loss of confidence in Pfang's ability to perform his job duties adequately.  In addition, LIT argues that the last sentence of paragraph 7 is an admission by a party opponent.

For the purpose of summary judgment motions, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matter stated therein."  FED. R. CIV. P. 56(e).  The rules of evidence prohibit a witness from testifying "unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  FED. R. EVID. 602.  In line with this authority, the United States Court of Appeals for the Fifth Circuit has repeatedly held that affidavit testimony based on inadmissible hearsay is not competent summary judgment evidence.  *See Metzler v. Kenner City*, 695 F. App'x 79, 81 (5th Cir. 2017); *Thomas v. Atmos Energy Corp.*, 223 F. App'x 369, 373 (5th Cir. 2007); *Goodwin v. Johnson*, 132 F.3d 162, 187-88 (5th Cir. 1997).  Statements that are not offered for the truth of the matter asserted and that are based on personal knowledge, however, are not hearsay.  *See Coleman*, 540 F. App'x at 306 (holding that co-workers' unsworn statements attached to human resource employee's affidavit were not hearsay because they were not admitted to prove the truth of the matter asserted, but rather to prove what the employees had told the human resources representative which she relied upon in making her decision to terminate plaintiff); *Brauninger*, 260 F. App'x at 636-37 (explaining that the employees' statements given to the human resource director during an investigation of a claim of sexual harassment did not constitute hearsay because they were offered to prove what was said to the human resource director—not the truth of what

15

was asserted in the statements); *Rountree v. FedEx Ground Package Sys., Inc.*, No. 3:23-CV-1089-N-BW, 2025 WL 2405210, at *13 (N.D. Tex. June 25, 2025), *adopted by* 2025 WL 2401328 (N.D. Tex. Aug. 19, 2025) (holding that the statements in a human resources representative's declaration were not inadmissible hearsay because the statements were not offered to prove the truth of the matter asserted); *see also Walker v. Harmony Pub. Sch.*, No. CV H-20-3872, 2022 WL 1760867, at *5 (S.D. Tex. May 23, 2022) (admitting grievances filed by employees against plaintiff for the limited purpose of evidencing the complaints that were made against plaintiff and the contents of those various complaints, which are relevant to what the Superintendent relied upon in conducting his investigation and making his decision to terminate plaintiff); *Cowen v. Allstate Ins. Co.*, No. CIV. A. 11-118, 2011 WL 5869449, at *4 (E.D. La. Nov. 22, 2011) (collecting cases).

In this instance, the court concurs with LIT's assessment of the evidence. First, the court reminds Pfang that it is not the court's role to evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes on a motion for summary judgment. *Fleming v. Bayou Steel BD Holdings II L.L.C.*, 83 F.4th 278, 293 (5th Cir. 2023) (citing *Anderson*, 477 U.S. at 255; *Guzman v. AllState Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021)). And, while LIT could have offered more detail in the declaration to explain exactly how Hill learned of the information at issue and from whom, these statements appear to be based on comments that were made to her concerning Pfang's performance. Thus, LIT's stated reason, the effect on Dr. Hill, is a permissible purpose for the use of out-of-court statements. *See, e.g., Reed*, 908 F.3d at 120 ("Ordinarily, a statement is not hearsay if it is offered to prove the statement's effect on the listener."); *see also United States v. Kizzee*, 877 F.3d 650, 659 (5th Cir. 2017) ("Testifying

16

officers may provide context for their investigation or explain 'background' facts" because the "out-of-court statements are not offered for the truth of the matter asserted therein, but instead for another purpose: to explain the officer's actions."). The court will consider the challenged statements only for the permissible purposes detailed above, and not for the truth of the matters asserted therein. As to Hill's statement in the last sentence of paragraph 7, "When I asked Dr. Pfang if he had engaged in discussions with the external stakeholders about lease agreements and costs, he admitted that he had," LIT argues this is an admission by a party opponent and falls under an exception to the hearsay rule. FED. R. EVID. 801(d)(2)(A). The court agrees. In this context, Pfang's objections to these portions of Hill's declaration are overruled.

2.    Prince's Email (Exhibits 13 & 14)

Pfang objects to LIT's Exhibits 13 and 14, each of which consists of Prince's email to Howard, listing his complaints about Pfang, his direct supervisor. Plaintiff objects to these exhibits for any purpose except to show that the email was sent, who received it, and the responses to it. According to Pfang, the complaints sent by Prince to Howard are out-of-court statements offered for the truth of the matter asserted therein. Pfang argues there is no hearsay exception that applies to Prince's email and that LIT has failed to elicit direct testimony from Prince via an affidavit or unsworn declaration, nor does LIT offer the testimony of any individual with personal knowledge of the issues raised by Prince. Instead, LIT relies on the business records exception to circumvent the hearsay objection. According to Pfang, the contents are not admissible under the business records affidavit exception and he further objects to the Business Records Declaration of Knape, particularly paragraph 3 of Exhibit 20, D. App. 45-46, which states that the exhibits attached to the declaration are derived from records kept by LIT in the regular course of business,

and that the exhibits were made in the regular course of business.  Pfang asserts that "completely unsubstantiated allegations are being given the dignity of business records, as if these were facts recorded under circumstances indicating their reliability and trustworthiness."  LIT has no real response to this objection except to say that the emails are properly authenticated business records.

"Neither a paper document, such as a letter or memo or note, nor an email, falls within the business-records exception of Rule 803(6) simply because it concerns a business matter." *Canatxx Gas Storage Ltd. v. Silverhawk Cap., Partners, LLC*, No. H-06-1330, 2008 WL 1999234, at *12 (S.D. Tex. May 8, 2008) (citing *United States v. Robinson*, 700 F.2d 205, 209-10 (5th Cir. 1983)).  Conventional letters, memos, and notes have, however, been deemed admissible under the business records exception if they were regularly made in the furtherance of the employer's needs and not for the personal purpose of the employee who made them.  *Id*. Courts have applied a similar approach when determining the admissibility of emails.  *Id*. (compiling cases).  "The mere fact that a producing defendant's employee sent an email while at work from a work computer to a co-employee does not mean that the email was composed or received concerning a matter within the scope of an employee's employment."  *In re Oil Spill By The Oil Rig "DEEPWATER HORIZON" In The Gulf Of Mex. On Apr. 20, 2010*, MDL No. 2178, 2012 WL 85447, at *4 (E.D. La. Jan. 11, 2012); *cf. Hager v. Brinker Tex., Inc.*, 102 F.4th 692, 703 (5th Cir. 2024) (holding the business records exception is inapplicable to writings not made, or shown to have been made, in the regular course of business, such as an accident report, a bill for labor and material, a diary or personal record book, a salesperson's letters as to a theft, and a statement of expenses for repairs) (citing 8 CYCLOPEDIA OF FED. PROC. (3d Ed.) § 26.372)).

Here, LIT makes no attempt to show that it imposed a business duty on Prince to make and maintain such records as required under Federal Rule of Evidence 803(6)(B).  Indeed, it would be difficult to conclude how Prince's email to Howard regarding his personal complaints against his direct supervisor could be considered, under any circumstances, to be a part of Prince's duties to LIT as Pfang's subordinate.  The rationale under the business record exception to hearsay is "that the inherent reliability of business records is 'supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation.'" *Canatxx Gas Storage Ltd.*, 2008 WL 1999234, at *12.  That reliability is lacking here.  Pfang's objection to LIT's Exhibits 13 and 14 and to those portions of Knape's Business Records Declaration in Exhibit 20 that rely on Exhibits 13 and 14 are sustained, and they will be stricken.

C.    <u>Title VII Claims</u>

Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1); *see Muldrow v. City of St. Louis*, 601 U.S. 346, 354; *Bostock v. Clayton County*, 590 U.S. 644, 654 (2020); *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 531 (2015); *Equal Emp. Opportunity Comm'n v. Abercrombie & Fitch Stores, Inc.*,

575 U.S. 768, 771 (2015); *Hamilton v. Dallas County*, 79 F.4th 494, 502 (5th Cir. 2023). "The purposes of Title VII are to achieve equality of employment opportunity and to make persons whole for injuries suffered on account of unlawful employment discrimination." *Floca v. Homcare Health Servs., Inc.*, 845 F.2d 108, 111 (5th Cir. 1988) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975)); *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013).

"Title VII discrimination can be established through either direct or circumstantial evidence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001); *accord Eaglin v. Tex. Child.'s Hosp.*, 801 F. App'x 250, 255 (5th Cir. 2020); *Wallace v. Seton Fam. of Hosps.*, 777 F. App'x 83, 87 (5th Cir. 2019); *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019). "Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *see Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 455 (2006); *Reeves*, 530 U.S. at 142-43; *Wallace*, 777 F. App'x at 87; *Cicalese*, 924 F.3d at 766. Under that framework, the plaintiff must initially establish a *prima facie* case by satisfying a multi-factor test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *Reeves*, 530 U.S. at 142-43; *Cicalese*, 924 F.3d at 766; *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 362-63 (5th Cir. 2013); *Turner v. Kans. City S. Ry. Co.*, 675 F.3d 887, 892 (5th Cir. 2012). "To establish a *prima facie* case, a plaintiff need only make a very minimal showing." *Ames v. Ohio Dep't. of Youth Serv.*, 605 U.S. 303, 308-09

(2025) ("For most plaintiffs, the first step of the *McDonnell Douglas* framework—the prima facie burden—is 'not onerous.'"); *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996); *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012); *Turner*, 675 F.3d at 892 ("The burden of establishing a *prima facie* case of disparate treatment is not onerous.").

If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate—but not prove—a legitimate, nondiscriminatory reason for its employment decision. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003); *Reeves*, 530 U.S. at 142; *McDonnell Douglas Corp.*, 411 U.S. at 802; *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020). "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 169-70 (2009)); *Shahrashoob v. Tex. A&M Univ.*, 125 F.4th 641, 653 (5th Cir. 2025) (quoting *Reeves*, 530 U.S. at 142 (quoting *Hicks*, 509 U.S. at 509)); *accord Park v. Direct Energy GP, L.L.C.*, 832 F. App'x 288, 295 (5th Cir. 2020); *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011). "The [employer] can meet this burden by submitting evidence that if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Sullivan v. Worley Catastrophe Servs., L.L.C.*, 591 F. App'x 243, 246 (5th Cir. 2014) (quoting *Hicks*, 509 U.S. at 507); *accord Vaughn*, 665 F.3d at 636.

"Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)); *accord Hicks*, 509 U.S. at 507;

21

*Malcolm v. Vicksburg Warren Sch. Dist. Bd. of Trs.*, 709 F. App'x 243, 248 (5th Cir. 2017).  In attempting to satisfy this burden, under the modified *McDonnell Douglas* approach, the plaintiff must "offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative)." *Vasquez-Duran v. Driscoll Child.'s Hosp.*, No. 20-40837, 2021 WL 3775350, at *4 (5th Cir. 2021) (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)); *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 702 (5th Cir. 2014) (quoting *Rachid*, 376 F.3d at 312); *accord Vaughn*, 665 F.3d at 636; *Fahim v. Marriott Hotel Servs.*, 551 F.3d 344, 349 (5th Cir. 2008).

In moving for summary judgment, LIT outlines the statement of the issues as follows:

(1) Pfang cannot make a *prima facie* case for disparate treatment based on his race or national origin because he was not qualified for his job, nor can he show that he was treated less favorably than any similarly situated non-Chinese or non-Asian employee;

(2) Pfang cannot meet the "but for" standard of causation for a Title VII retaliation claim because he cannot establish that he would not have been disciplined or terminated if he had not complained about discrimination;

(3) Pfang cannot show that LIT's stated reasons for terminating his employment — his failure to perform his job duties adequately — is a pretext for illegal discrimination or retaliation; and

(4) Pfang cannot make a *prima facie* case for a hostile work environment because he did not suffer any discriminatory harassment so severe or pervasive as to affect the conditions of his employment.

###### 1.    Disparate Treatment

LIT argues that Pfang's claim of disparate treatment fails because he cannot establish that he was qualified for his position or that he was disciplined and terminated because of his race or national origin.   Pfang responds that there is a genuine dispute of material fact as to his qualifications for the position and whether he was treated less favorably than similarly situated employees outside of his protected class.

To establish a *prima facie* case of disparate treatment, the plaintiff must show that:

(1)    he is a member of a protected class;

(2)    he is qualified for the position;

(3)    he suffered an adverse employment action; and

(4)    others outside the class who were similarly situated were treated more favorably than he.

*Deitrich v. United Parcel Serv., Inc. (Ohio),* No. 24-50316, 2025 WL 445050, at *4 (5th Cir. Feb. 10, 2025) (citing *Owens v. Circassia Pharm.*, 33 F.4th 814, 825 (5th Cir. 2022)); *Hamilton v. Dallas County*, 79 F.4th 494, 502 (5th Cir. 2023) (to plead an adverse employment action, a plaintiff need only allege facts plausibly showing discrimination in hiring, firing, compensation, or in the "terms, conditions, or privileges" of his or her employment and need not also show an "ultimate employment decision."); *Walker v. Smith*, 801 F. App'x 265, 269 (5th Cir. 2020); *Williams v. United Parcel Serv., Inc.*, 757 F. App'x 342, 344 (5th Cir. 2018).   LIT does not dispute that Pfang was a member of a protected class or that he suffered an adverse employment action.

LIT argues that Pfang was not qualified for the position of AVP of Workforce and Strategic Initiatives because of his repeated failure to perform his job duties adequately.  Some circuits have held that to be a qualified employee under Title VII, a plaintiff must "prove that he was performing his job at a level which met his employer's legitimate expectations." *Meadows v. Ford Motor Co.*, 21 F. App'x 302, 304 (6th Cir. 2001) (citing *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990) (quoting *Huhn v. Koehring*, 718 F.2d 239, 243 (7th Cir. 1983))); *see Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989, 996-97 (7th Cir. 2002) (citing *Hong v. Child.'s Mem'l Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993)); *Merritt v. Aylmer*, 960 F.2d 143, 1992 WL 83271, at *3 (1st Cir. 1992) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979)).  The Fifth Circuit, however, has specifically declined to adopt this approach.  *See Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1505-06 (5th Cir. 1988) (abrogated on other grounds).  In *Bienkowski*, the court reasoned that the burden imposed by a definition of "legitimate expectations" cannot be reconciled with the Supreme Court of the United States's attempts, in *McDonnell Douglas* and *Burdine*, to simplify presentation of an employment discrimination case. *See id.* at 1505.  The court observed that "[p]lacing a plaintiff's 'qualifications' in issue at both the *prima facie* case and pretext stages of a termination case is an unnecessary redundancy." *Id.*

"[A] plaintiff challenging his termination or demotion can ordinarily establish a prima facie case of . . . discrimination by showing that he continued to possess the necessary qualifications for his job at the time of the adverse action." *Bienkowski,* 851 F.2d at 1505; *see Equal Emp. Opportunity Comm'n v. Ryan's Pointe Hous., L.L.C.*, No. 19-20656, 2022 WL 4494148, at *5 & nn.25-26 (5th Cir. Sept. 27, 2022) (citing *Bienkowski* and noting that "the qualification inquiry pursuant to the ADEA and Title VII in the wrongful discharge context are 'identical'" (quoting

*Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999))); *Ramirez v. Lhoist N. Am. of Tex., LLC*, No. SA-21111-CV-01050-XR, 2023 WL 175007, at *4 (W.D. Tex. Jan. 11, 2023); *Williams v. Red River Beverage Grp.*, No. 17-1291, 2020 WL 6827794, at *4 (W.D. La. Nov. 19, 2020); *Shields v. Boys Town La., Inc.*, 194 F. Supp. 3d 512, 528-29 (E.D. La. 2016). The Fifth Circuit elaborated by interpreting "necessary qualifications" to mean that "the plaintiff had not suffered physical disability or loss of a necessary professional license or some other occurrence that rendered him unfit for the position for which he was hired." *Bienkowski*, 851 F.2d at 1505 n.3; *Ryan's Pointe Hous., L.L.C.*, 2022 WL 4494148, at *5; *Williams*, 2020 WL 6827794, at *4; *Shields*, 194 F. Supp. at 529. Hence, in this circuit, a *prima facie* case is established once a plaintiff demonstrates that the objective employment qualifications have been met. *See Allen v. U.S. Postal Serv.*, 63 F.4th 292, 301 n.3 (5th Cir. 2023) ("[T]he district court properly found that [the plaintiff] need only show that [he] meets 'objective hiring criteria.'" (quoting *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 681 (5th Cir. 2001))).

Subjective criteria are not considered at this stage of the proceeding. *See Medina*, 238 F.3d at 681; *Lindsey v. Prive Corp.*, 987 F.2d 324, 327 (5th Cir. 1993). "Establishing qualifications is an employer's prerogative, . . . but an employer may not utilize wholly subjective standards by which to judge the employees' qualifications and then plead lack of qualification" when its employment decisions are challenged as discriminatory. *Lewallen v. City of Beaumont*, 394 F. App'x 38, 44 (5th Cir. 2010) (quoting *Medina*, 238 F.3d at 681); *Johnson v. Louisiana*, 351 F.3d 616, 622 (5th Cir. 2003) (quoting *Medina*, 238 F.3d at 681); *Crawford v. W. Elec. Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980) (citing *Rowe v. Gen. Motors Corp.*, 457 F.2d 348, 358 (5th Cir. 1972)). While "subjective employment criteria may serve legitimate functions, they also

25

provide opportunities for unlawful discrimination." *Lindsey*, 987 F.2d at 327; *see Medina*, 238 F.3d at 681. Therefore, "it is inappropriate to decide as a matter of law that an employee is unqualified because he has failed to meet entirely subjective . . . criteria," as LIT urges. *Medina*, 238 F.3d at 681; *see Johnson*, 351 F.3d at 622.[4]

Here, the record reflects that Pfang met the qualifications for the position of AVP of Workforce and Strategic Initiatives. "Qualifications" for a job refer to objective factors, such as "degrees, certificates, skills and experience." *Loeb*, 600 F.2d at 1013 n.10; *see Bienkowski*, 851 F.2d at 1505. Subjective criteria are not considered in the determination of basic qualifications for a job. *See Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 350-51 (5th Cir. 2007) (reversing a district court that failed to consider *Bienkowski* in its analysis); *see also Medina*, 238 F.3d at 681; *Lindsey*, 987 F.2d at 327; *Crawford*, 614 F.2d at 1315.

According to LIT, as AVP of Workforce and Strategic Initiatives, Pfang was responsible for identifying and developing strategic plans relating to the development of new academic programming/course offerings and enhancing existing academic programs. The uncontested evidence reflects that Pfang holds a Ph.D. in Management, an M.B.A., and a post-graduate certificate in Education and Training. Prior to his employment with LIT, for a period of over twenty years, Pfang held positions at educational institutions such as Dean of Professional and Technical Education, Assistant Dean and Interim Department Chair, Assistant to the President (Chief of Staff), Interim Vice President for Academic Affairs, Interim Coordinator of Special Projects, Program Director for M.A. in Global Management, Director Regents Business Forum, Program Manager for M.A. in International Business Administration, Dean School of Business

---

[4] LIT seems to overlook circuit precedent with respect to this issue.

Management, and Chief Executive Officer and Director of Operations, to name just a few. Pfang had direct experience in developing and advancing workforce programs in the academic setting. Furthermore, the record reflects that Howard clearly thought Pfang was qualified as he offered Pfang the position of AVP for Educational Support and Special Assistant to the President, and he then asked Pfang to take on the additional role of AVP for Workforce and Strategic Initiatives, first in an interim capacity and then permanently.

Hence, the summary judgment evidence demonstrates that Pfang was qualified for the position. *See Kendricks v. Methodist Child.'s Home*, Civil No. 6:19-CV-00518-ADA, 2021 WL 1298930, at *3 (W.D. Tex. Apr. 7, 2021) (holding that ten years of experience established *prima facie* case); *Hardmon v. U.L. Coleman*, Civil Action No. 17-1118, 2021 WL 606871, at *3 (W.D. La. Feb. 16, 2021) (finding that ten years of experience as maintenance supervisor established *prima facie* case); *Harrison v. Chipolbrok Am., Inc.*, Civil Action No. 4:17-CV-1951, 2019 WL 1755530, at *6 (S.D. Tex. Apr. 19, 2019) (holding that thirty years of experience as a customer service manager established *prima facie* case); *Roberts v. FMC Tech., Inc.*, No. Civ. A. 1:03CV636PD, 2005 WL 1475310, at *4 (N.D. Miss. June 22, 2005) (finding that twenty-seven years of experience as a QA inspector qualified Roberts as an QA Inspector); *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 (5th Cir. 1996) (recognizing that a plaintiff with twenty years of experience in the automotive field was qualified for a director position at defendant's car dealership). LIT does not contend that Pfang was lacking in terms of education, skills, or experience. Instead, LIT maintains that he was unqualified because his job performance was

unsatisfactory, as assessed, at least in part, by subjective criteria. The evidence demonstrates, however, that Pfang was well-qualified for the position of AVP for Workforce and Strategic Initiatives at LIT, a technical institute that grants associate degrees and certificates, thus satisfying the second element of a *prima facie* case.

Pfang must also demonstrate that employees outside his protected class received more favorable treatment than he under nearly identical circumstances. *Saketkoo v. Admin. of Tulane Educ. Fund*, 31 F.4th 990, 997-98 (5th Cir. 2022); *Turner*, 675 F.3d at 893-96; *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005); *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 345 (5th Cir. 2005). "A variety of factors are considered when determining whether a comparator is similarly situated, including job responsibility, experience, and qualifications." *Saketkoo*, 31 F.4th at 998 (quoting *Herster v. Bd. of Sup. Of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018)). "The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Brown v. San Antonio Food Bank*, No. 23-50564, 2024 WL 1300286, at *4 n.9 (5th Cir. Mar. 27, 2024) (quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)); *Turner*, 675 F.3d at 893 (quoting *Lee*, 574 F.3d at 260); *accord Drechsel v. Liberty Mut. Ins. Co.*, 695 F. App'x 793, 796 (5th Cir. 2017); *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 659 (5th Cir. 2012). Also, "the conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Lee*, 574 F.3d at

260; *accord Sacchetti v. Optiv Sec., Inc.*, 819 F. App'x 251, 254 (5th Cir. 2020). But, "[e]ach employee's track record at the company need not comprise the identical number of identical infractions, albeit these records must be comparable." *Lee*, 574 F.3d at 260-61.

Nevertheless, "[a]pplied to the broader circumstances of a plaintiff's employment and that of his proffered comparator, a requirement of complete or total identity rather than near identity would be essentially insurmountable, as it would only be in the rarest of circumstances that the situations of two employees would be totally identical." *Id.* at 260; *see Harville v. City of Houston*, 945 F.3d 870, 875 (5th Cir. 2019) ("We have emphasized that 'nearly identical' is not synonymous with 'identical.'")*; accord Saketkoo*, 31 F.4th at 998 ("[W]e require an employee to show that the comparator's conduct is 'nearly identical,' not strictly identical."). As the Fifth Circuit has explained, "it is sufficient that the ultimate decisionmaker as to employees' continued employment is the same individual, even if the employees do not share an immediate supervisor." *Lee*, 574 F.3d at 260-61. Moreover, "the similitude of employee violations may turn on the 'comparable seriousness' of the offenses for which discipline was meted out and not necessarily on how a company codes an infraction under its rules and regulations." *Id.* at 261 (citing *McDonald v. Santa Fe Trail*, 427 U.S. 273, 283 n.11 (1976); *McDonnell Douglas Corp.*, 411 U.S. at 804). "Otherwise, an employer could avoid liability for discriminatory practices simply by coding one employee's violation differently from another's." *Lee*, 574 F.3d at 260-61. If "the difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis." *Turner*, 675 F.3d at 893;

*see Burke-Fowler v. Orange County*, 447 F.3d 1319, 1325 (11th Cir. 2006) ("Different types and degrees of misconduct may warrant different types and degrees of discipline.").

Here, LIT argues that there is no appropriate comparator because Pfang cannot show that there is any other non-Asian, non-Chinese AVP who engaged in the same or similar misconduct as Pfang and was treated more favorably.  Specifically, LIT contends that Prince, Hill, and Gonzales, Pfang's comparators, did not have the same job duties as Pfang and did not engage in the same or similar misconduct as Pfang.  The court disagrees, finding there is a genuine dispute of material fact at least as to Gonzales.[5]

The record reflects that Gonzales is a Hispanic male who directly reported to Howard as a member of his executive team and held the position of VP of Finance and Operations.  Pfang held the position of AVP of Workforce and Strategic Initiatives and directly reported to Howard until Hill was named as Provost.  The record reflects that despite his announced resignation, Howard was still involved in the day-to-day supervision of his executive team, even going so far as to investigate the failure to report the automobile accident at issue alongside Hill.  Howard, as LIT President, authorized Hill to terminate Pfang from his employment with regard to his failure to report the accident.  As AVP of Finance and Operations, Gonzales was in charge of insurance, human resources, and facilities for LIT, and Howard was his direct supervisor.  The record

---

[5] The court focuses its attention on Gonzales because both he and Pfang held similar positions and held varying degrees of responsibility over the truck accident at issue, and Howard had the ultimate decision-making authority with respect to termination as to both.  That is not to say that neither Hill as Provost nor Prince as Pfang's subordinate could not serve as comparators based on the facts presented.  Finding that Pfang has created a genuine dispute of material fact as to one out of three potential comparators, however, is sufficient to defeat summary judgment.

reflects that Gonzales also failed to report the accident to Howard, his direct supervisor, yet he was not terminated. In fact, the competent summary judgment evidence indicates that Gonzales failed even to obtain insurance for the truck driving instructor involved in the accident, which appears to be an oversight of far greater consequence, yet he was not even reprimanded.[6] The court finds that Pfang has created a genuine dispute of material fact as to whether other employees outside of his protected class who were similarly situated were treated more favorably than he. The law does not require complete or total identity. *Lee*, 574 F.3d at 260-61; *see Harville,* 945 F.3d at 875. Moreover, the two offenses that yielded dissimilar outcomes involved "comparable seriousness." *Lee*, 574 F.3d at 261 (citing *McDonald*, 427 U.S. at 283 n.11; *McDonnell Douglas Corp.*, 411 U.S. at 804). Accordingly, LIT is not entitled to summary judgment as to Pfang's disparate treatment claim. "The burden of establishing a *prima facie* case of disparate treatment is not onerous." *Turner*, 675 F.3d at 892.

2.    <u>Retaliation</u>

To establish a *prima facie* case of Title VII retaliation, Pfang must show:

(1)    he engaged in an activity protected by Title VII;

(2)    he suffered an adverse employment action; and

(3)    a causal connection exists between the protected activity and the adverse employment action.

---

[6] LIT does not formally challenge any of Pfang's summary judgment evidence. LIT merely asserts, at times, that Pfang's declaration is conclusory. It is not; rather, Pfang's declaration relies on supporting documentary evidence. LIT briefly mentions Pfang's probationary status and disciplinary history as distinguishing factors. LIT, however, fails to offer any evidence that contradicts Pfang's allegations regarding the similarities between Pfang and Gonzales.

*Rodriguez v. City of Corpus Christi*, 129 F.4th 890, 898 (5th Cir. 2025) (quoting *Starnes v. Wallace*, 849 F.3d 627, 631-32 (5th Cir. 2017)); *Hawthorne v. Birdville Indep. Sch. Dist.*, No. 24-10398, 2025 WL 457312, at *2 (5th Cir. Feb. 11, 2025) (quoting *Newbury v. City of Windcrest*, 991 F.3d 672, 680 (5th Cir. 2021)); *Willis v. W. Power Sports, Inc.*, No. 23-10687, 2024 WL 448354, at *2 (5th Cir. Feb. 6, 2024) (citing *Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 433 (5th Cir. 2021)); *Saketkoo*, 31 F.4th at 1000; *cf. Yarbrough v. SlashSupport, Inc., Glow Networks, Inc.*, No. 24-40421, 2025 WL 2647148, at *2 (5th Cir. Sept. 16, 2025) (plaintiff no longer required to show an "ultimate employment decision" to establish the adverse employment action element to establish a retaliation claim).  LIT concedes that Pfang engaged in protected activity when he sent the April 13, 2022, email to Hill and Knape alleging that he was being discriminated against and that he suffered an adverse employment decision when he was terminated.  LIT challenges only the causation element of Pfang's *prima facie* case of retaliation. LIT states, "there is simply no evidence of any causal connection between Pfang's termination and his discrimination complaint."

Although the third element of a *prima facie* case—causation—is similar to the ultimate issue in an unlawful retaliation claim, the standard for establishing a causal link at the *prima facie* case stage is much less stringent.  *Richards v. Lufkin Indus., L.L.C.*, 804 F. App'x 212, 215 (5th Cir. 2020); *Starnes*, 849 F.3d at 635; *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2005).[7]  As the Fifth Circuit has commented in the Title VII context:

---

[7] LIT once again misstates the burden of proof for the *prima facie* stage, asserting Pfang is required to prove "but for" causation which is the requirement for the pretext phase.

> At first glance, the ultimate issue in an unlawful retaliation case—whether the defendant discriminated against the plaintiff *because* the plaintiff engaged in conduct protected by Title VII—seems identical to the third element of the plaintiff's prima facie case—whether a *causal* link exists between the adverse employment action and the protected activity. However, the standards of proof applicable to these questions differ significantly.

*Long v. Eastfield Coll.*, 88 F.3d 300, 304 n.4 (5th Cir. 1996). In order to establish the requisite causal link, a plaintiff need not prove that his protected activity was the sole factor in motivating the employer's challenged decision. *Saketkoo*, 31 F.4th at 1001; *Wallace*, 777 F. App'x at 91 (quoting *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002)). Rather, a causal link is established when the evidence demonstrates that the employer's decision to take adverse action was based in part on knowledge of the employee's protected activity. *Smith v. Kendall*, No. 23-50713, 2024 WL 4442040, at *7 (5th Cir. Oct. 8, 2024); *Saketoo*, 31 F.4th at 1001; *Wright*, 990 F.3d at 434; *Hauser v. Schneider Elec. Sys. USA, Inc.*, 819 F. App'x 247, 251 (5th Cir. 2020) ("A minimum requirement of causation is that the 'employer knew about the employee's protected activity.'" (quoting *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003)); *Ackel*, 339 F.3d at 385-86 (citing *Medina*, 238 F.3d at 684). "The 'causal link' element of the *prima facie* case is satisfied when the plaintiff shows that the employment decision and his protected activity 'were not wholly unrelated.'" *Medina*, 238 F.3d at 684 (quoting *Simmons v. Camden Cnty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985)); *accord Amsel v. Tex. Water Dev. Bd.*, 464 F. App'x 395, 402 (5th Cir. 2012); *Hinojosa v. McCarthy*, No. 5:19-cv-1297-JKP-HJB, 2020 WL 5750007, at *4 (W.D. Tex. Sept. 25, 2020); *Cornelius v. Hewlett Packard Enter. Co.*, No. 4:16-CV-887, 2017 WL 4653238, at *3 (E.D. Tex. Oct. 17, 2017).

To satisfy the causation prong, "a plaintiff must show that the decisionmaker who committed the adverse employment action was aware of the plaintiff's protected activity." *Perches v. Elcom, Inc.*, 500 F. Supp. 2d 684, 692 (W.D. Tex. 2007) (citing *Manning*, 332 F.3d at 883); *see Wright*, 990 F.3d at 434; *Equal Emp. Opportunity Comm'n v. EmCare Inc.*, 857 F.3d 678, 683 (5th Cir. 2017); *Gollas v. Univ. of Tex. Health Sci. Ctr.*, 425 F. App'x 318, 325 (5th Cir. 2011); *Ackel*, 339 F.3d at 385-86; *Nelson v. Lake Charles Stevedores, L.L.C.*, No. 2:11-CV-1377, 2014 WL 1339827, at *10 (W.D. La. Apr. 2, 2014) (opining that plaintiff did not meet the causal link prong of her prima facie case where she submitted "no evidence that those who allegedly denied her work even had knowledge of the E.E.O.C. complaint"). "If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct." *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999); *accord Wright,* 990 F.3d at 434; *Ackel*, 339 F.3d at 385-86; *Manning*, 332 F.3d at 883; *Briceno-Belmontes v. Coastal Bend Coll.*, No. 2:20-CV-00114, 2022 WL 673854, at *6 (S.D. Tex. Mar. 5, 2022).

The consideration of three factors may be helpful in determining whether a causal link has been demonstrated at the *prima facie* case stage:  (1) the plaintiff's past disciplinary record, (2) whether the employer followed its typical policies and procedures when taking adverse action against the employee, and (3) the temporal relationship between the employee's conduct and the adverse act. *English v. Perdue*, 777 F. App'x 94, 98 (5th Cir. 2019); *Nowlin v. Resol. Tr. Corp.*, 33 F.3d 498, 507-08 (5th Cir. 1994) (citing *Jenkins v. Orkin Exterminating Co.*, 646 F. Supp. 1274, 1277 (E.D. Tex. 1986)).

The causation element may be proved when the protected activity and the adverse employment action occur "very close" in time. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (finding a period of twenty months between protected act and adverse employment action to suggest "no causality at all"); *Brown*, 969 F.3d at 578; *Porter v. Houma Terrebonne Hous. Auth. Bd. Of Com'rs.*, 810 F.3d 940, 948 (5th Cir. 2015) (finding a period of six-and-a-half weeks sufficient to establish a causal link at the *prima facie* stage); *Roberts v. Unitrin Specialty Lines Ins. Co.*, 405 F. App'x 874, 879 (5th Cir. 2010). The Fifth Circuit allows for an "inference of causation . . . where the adverse employment action occurs in close temporal proximity to the protected conduct." *Richard v. Cingular Wireless LLC*, 233 F. App'x 334, 338 (5th Cir. 2007) (citing *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001)); *Roberts*, 405 F. App'x at 879; *Cruz v. R2Sonic, LLC*, 405 F. Supp. 3d 676, 692 (W.D. Tex. 2019); *U.S. Equal Emp. Opportunity Comm'n v. Gulf Logistics Operating, Inc.*, 371 F. Supp. 3d 300, 308 (E.D. La. 2019). The *Evans* court "relied on decisions from district courts [within the Fifth Circuit] that found 'a time lapse of up to four months . . . sufficient to satisfy the causal connection for summary judgment purposes.'" *Richard*, 233 F. App'x at 338 (citing *Evans*, 246 F.3d at 354); *Garcia v. Prof'l Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019) (holding that a two-and-a-half month gap gave rise to an inference of causation); *Johnson v. Halstead*, 916 F.3d 410, 421 (5th Cir. 2019) (holding that a three-month period supports "an allegation that [the filing of Plaintiff's complaint and his transfer] were related"). *But see Everett v. Cent. Miss., Inc. Head Start Program*, 444 F. App'x 38, 47 & n.31 (5th Cir. 2011) (noting, in an unpublished opinion, that three- and four-month periods have been found to be insufficient to establish a *prima facie*

case in certain circumstances); *Flanner v. Chase Inv. Servs. Corp.*, 600 F. App'x 914, 922 (5th Cir. 2015) (four-month gap, standing alone, was insufficient).  Thus, an inference of causation usually does not arise from gaps longer than four months.  In this case, because only nine days elapsed between Pfang's April 13, 2022, email complaining about discrimination to Hill and Knape and his termination, an inference of causation is warranted.  *See Garcia*, 938 F.3d at 243; *Johnson*, 916 F.3d at 421; *Richard*, 233 F. App'x at 338.  Hence, Pfang has established a *prima facie* case of retaliation.[8]

### 3.    Pretext

Finding that Pfang has established a *prima facie* case of disparate treatment and retaliation, the burden then shifts to LIT to articulate—but not prove—a legitimate, nondiscriminatory reason for its employment decision.  *Raytheon Co.*, 540 U.S. at 49 n.3; *Reeves*, 530 U.S. at 142; *McDonnell Douglas Corp.*, 411 U.S. at 802; *Brown*, 969 F.3d at 577.  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves*, 530 U.S. at 142 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 509); *accord Shahrashoob*, 125 F.4th at 653; *Park*, 832 F. App'x at 295; *Vaughn*, 665 F.3d at 636.  LIT asserts that Pfang was not terminated based on a single incident, but rather, upon his repeated failure to perform his job duties adequately. The specific examples include:

---

[8] LIT failed to challenge Pfang's *prima facie* case of retaliation properly by advancing the wrong standard.  LIT argues for the "but for" standard which is applicable to the pretext phase.  *See Williams v. B R F H H Shreveport, L.L.C.*, 801 F. App'x 921, 926 (5th Cir. 2020) ("But the prima facie causal link analysis and the pretext analysis are both causation inquiries, and we have noted that the functional difference between the two is not the type of evidence used, but instead that 'the burden [at the pretext stage] is more stringent.'") (quoting *Medina*, 238 F.3d at 685).

36

1.    Convening a meeting with Beaumont city officials and leaving the meeting early without notifying his colleague that he would be leaving the meeting early and preparing the colleague to handle the meeting in his absence;

2.    Failing to submit program data regarding the aviation proposal to Howard in a timely manner and after numerous requests;

3.    Refusing to follow Howard's directive to slow down the progression of the aviation proposal;

4.    Discussing program lease agreements and other contractual obligations and costs relating to the proposed aviation program with external stakeholders without authority to do so; and

5.    Neglecting to inform his supervisor of an important auto accident affecting the portfolio he oversaw.[9]

Because LIT has carried its burden of articulating a legitimate, nondiscriminatory reason for its actions, Pfang must "produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination . . . [and] must rebut each discrete reason proffered by the employer." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015); *see Reeves*, 530 U.S. at 143; *Hicks*, 509 U.S. at 507-08; *McDonnell Douglas Corp.*, 411 U.S. at 804; *Vaughn*, 665 F.3d at 637.  Pfang may meet his burden "either through evidence of disparate treatment or by showing that the employer's explanation is false or 'unworthy of credence.'"  *Delaval v. Ptech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 480 (5th Cir. 2016) (quoting *Laxton*, 333 F.3d at 578); *see Durrani v. GuideOne Nat'l Ins. Co.*, No. 23-20485, 2024 WL 3066040, at *4 (5th Cir. June 20, 2024); *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 483-84 (5th Cir. 2023); *DeVoss v. Sw. Airlines Co.*, 903 F.3d 487, 492 (5th Cir. 2018).  The

---

[9] The only reason articulated in Hill's final letter to Pfang dated April 21, 2022, was his failure to "promptly and timely report this motor vehicle collision."

evidence must be of sufficient weight that "a jury could conclude that the employer's articulated reason is pretextual." *Gross v. Carlisle Constr. Materials, L.L.C.*, No. 24-60382, 2025 WL 2427194, at *2 (5th Cir. Aug. 22, 2025)(quoting *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, at 615 (5th Cir. 2009)); *see Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 575 n.5 (5th Cir. 2004) ("[T]he plaintiff always bears the burden of 'persuading the trier of fact that the defendant intentionally discriminated' against [him]." (quoting *Reeves*, 530 U.S. at 143)). To satisfy this burden, the plaintiff must produce "substantial evidence" that the employer's proffered reasons for its actions are false or unworthy of credence. *Delaval*, 824 F.3d at 480 (citing *Burton*, 798 F.3d at 233); *see Gosby v. Apache Indus. Serv. Inc.*, 30 F.4th 523, 527 (5th Cir. 2022); *Head v. City of Columbus Light & Water Dep't*, 746 F. App'x 389, 392 (5th Cir. 2018). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men [or women] in the exercise of impartial judgment might reach different conclusions." *Wallace*, 777 F. App'x at 89 (quoting *Laxton*, 333 F.3d at 579); *see January v. City of Huntsville*, 74 F.4th 646, 654 (5th Cir. 2023).

While the employer's proffered non-discriminatory justification renders the presumption of discrimination no longer operative, "evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's *prima facie* case, is likely to support an inference of discrimination even without further evidence of defendant's true motive." *Nall*, 917 F.3d at 348 (quoting *Diggs v. Burlington N. & Santa Fe Ry. Co.*, 742 F. App'x 1, 4 (5th Cir. 2018)); *Haire*, 719 F.3d at 365 n.10; *see Reeves*, 530 U.S. at 147 ("[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative

explanation . . . ."). Indeed when "the evidence of pretext is substantial, the plaintiff may create a genuine issue of material fact without independent evidence that discrimination was the real reason for the adverse employment action." *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 903 (5th Cir. 2000) (citing *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372 (5th Cir. 1997)); *see Reeves*, 530 U.S. at 143; *Burton*, 798 F.3d at 241. Nevertheless, "discrimination suits still require evidence of discrimination." *Rubinstein v. Adm'rs of the Tulane Educ. Fund*, 218 F.3d 392, 400 (5th Cir. 2000); *accord Kopszywa v. Home Depot USA, Inc.*, 620 F. App'x 275, 279 (5th Cir. 2015) ("[E]vidence of pretext will not always be sufficient to survive summary judgment."); *Churchill v. Tex. Dep't of Crim. Just.*, 539 F. App'x 315, 320 (5th Cir. 2013). "[T]he question for summary judgment is whether a rational fact finder could find that the employer discriminated against the plaintiff[. . . . ] [on the basis of race]." *Pratt v. City of Houston*, 247 F.3d 601, 606 (5th Cir. 2001) (citing *Hicks*, 509 U.S. at 511).

"On summary judgment . . . the plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision." *York v. Ezell*, No. 24-50770, 2025 WL 1577822, at *3 (5th Cir. June 4, 2025); *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002); *accord Franklin v. Boeing Co.*, 232 F. App'x 408, 410 (5th Cir. 2007); *Rubinstein*, 218 F.3d at 400. Hence, the plaintiff's assertion of pretext must be supported by more than mere self-serving, subjective, or speculative allegations; a plaintiff must provide sufficiently specific, substantive reasons for his claim of pretext. *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010); *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 487 (5th Cir. 2008); *Auguster v. Vermillion Par. Sch. Bd.*, 249 F.3d 400, 403 (5th Cir.

2001).  If the evidence presented is "not so persuasive so as to support an inference that the real reason was discrimination," then the plaintiff has failed to meet his burden.  *Rubinstein*, 218 F.3d at 400; *accord Price*, 283 F.3d at 724.  "Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."  *Reeves*, 530 U.S. at 148; *accord West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003); *Price*, 283 F.3d at 720; *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001).  For example, summary judgment would be appropriate "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  *Reeves*, 530 U.S. at 148; *accord Burrell*, 482 F.3d at 415; *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 351 n.14 (5th Cir. 2005).  This, however, is not such a case.

Here, the court finds that Pfang has put forth sufficient evidence to create a genuine dispute of material fact as to the credence of LIT's explanation for his termination.  Contrary to LIT's assertion, Pfang does not rely solely on his own statements denying the allegations against him, but he rebuts each distinct reason proffered by LIT with substantial evidence.  The summary judgment evidence is replete with factual disputes proper only for resolution by a jury.

a.    <u>The Aviation Program</u>

The legitimate non-discriminatory reasons LIT proffers for Pfang's termination with respect to the aviation program are that he (1) convened a meeting with Beaumont city officials on March 10, 2022, and left the meeting early without notifying his colleague and failed to prepare

40

the colleague to handle the meeting in his absence; (2) failed to submit program data regarding the aviation proposal to Howard in a timely manner and after numerous requests; (3) refused to follow Howard's directive to slow down the progression of the aviation proposal; and (4) discussed program lease agreements and other contractual obligations and costs relating to the proposed aviation program with external stakeholders without authority to do so.

It is undisputed that Pfang was responsible for looking into the feasibility of an aviation maintenance program and a private pilot's associate degree program on behalf of LIT.  It is also undisputed that Tiffany Williams-Parker ("Williams-Parker"), the program chair who is African American, had been developing these programs during the months prior to Pfang's arrival.  Along with Pfang, Williams-Parker set up the March 10, 2022, meeting in question with Beaumont city officials, including Hill on the scheduling email.  Both Hill and Howard were informed of the progress of the meeting shortly after it occurred as well as the city representatives' desire to tour the LIT facility on March 31, 2022.  Neither Hill nor Howard objected to the tour or an introductory meeting with city officials, as suggested by Pfang.[10]  While the record reflects that Howard emailed Pfang, and presumably Williams-Parker,[11] on March 16, 2022, directing them to slow down, he followed-up with an email on March 17, 2022, explicitly approving Hill's attending the March 31, 2022, meeting in Howard's absence.  The March 16, 2022, email states:

---

[10] In fact, a March 15, 2022, email from Hill to Williams-Parker praised her for networking with Dr. Sina who appeared "to be a valuable contact for LIT and the potential aviation program."  Howard was copied on this email and voiced no objections to it.

[11] The email provided is addressed to "All" but does not indicate the recipients of the email.  In response to the email, Pfang informed Howard that he would speak with Williams-Parker and Hill regarding a way forward.

41

> Yes, I asked for new programs but have expressed concern about the utility of aviation maintenance and professional pilot.  Not [t]o say, don't pursue these . . . but slow down . . . before investing so much time with meetings/tours/etc.  Let's make sure it's worth it.  So tomorrow [morning], send me the data you (already) have - your initial enrollment projections, local needs, cost projections, revenue model.

Howard then sent an email on March 17, 2022, stating, "Despite what my previous email read, I'm still OK with you all meeting . . . but refocus those priorities."

This undisputed evidence aligns with Pfang's declaration stating that Howard "conveyed many conflicting priorities to me, but new program development was one of them" and directly challenges the legitimacy of LIT's first and third proffered reasons for termination with respect to the aviation program.  If Howard and Hill truly wanted Pfang to refocus his efforts elsewhere, the best opportunity to convey this was when they learned of the meeting.  Furthermore, the competent summary judgment evidence demonstrates that Williams-Parker had been developing the program long before Pfang's employment, with encouragement from Howard and Hill, and she actually scheduled the meeting with city officials in consultation with Pfang because she was going to be the face of the program.  Thus, LIT's contention that Pfang's leaving the meeting early to let Williams-Parker continue and roundout the discussions with city officials was deemed an offense worthy of reprimand and ultimately, termination, is highly suspect.

As to LIT's proffered reason that Pfang's discussing program lease agreements and other contractual obligations and costs relating to the proposed aviation program with external stakeholders without authority to do so, the court notes that the evidence with respect to this claim is vigorously disputed.  LIT relies only on Hill's statement, "When I asked Dr. Pfang if he had

engaged in discussions with the external stakeholders about lease agreements and costs, he admitted that he had." Pfang directly challenges this alleged admission, stating:

> Dr. Howard gave the go-ahead for the March 31, 2022, on-campus visit by Chris Meaux and Chris Boone, to further discuss the potential for aviation programs at LIT, and for them to meet LIT leadership. *See* Exhibit K. I anticipated that the meeting would include some talk about leases and costs. I had never discussed lease terms with either Chris Meaux or Chris Boone, or anyone else in Beaumont. No drafts had been prepared. We had only discussed the idea of leases. In my experience, I was well aware that the institution's legal department would have to get involved. As far as costs, I had only asked that LIT receive favorable terms in any agreement, since it was an institution of higher learning. That is the extent of my role.

This is bolstered by Pfang's contemporaneous April 13, 2022, email to Hill after he was issued a verbal warning in which he states: "I did not commit LIT to anything: my meetings were always exploratory – please see attached emails which confirm that I have kept you informed and that I had never sought to commit LIT to anything." Contrary to LIT's assertions, Pfang is not relying only on self-serving, subjective, or speculative allegations; instead, he proffers contemporaneous evidence that disputes this claim.

Finally, LIT's proffered reason that Pfang failed to submit program data to Howard in a timely manner and after numerous requests is not supported by the competent summary judgment evidence. There is only one piece of evidence suggesting that Howard made such a request and it is found in the March 16, 2022, email quoted above. The request to submit program data is never mentioned again in any of the attached summary judgment evidence. The March 16, 2022, email, by itself, cannot support LIT's proffered reason that Pfang failed to produce the data "after numerous requests." Furthermore, if Howard actually wanted Pfang to "slow down" and focus

his energies elsewhere, why did he request Pfang to supply "initial enrollment projections, local needs, cost projections," and revenue models?  This is yet another example of Howard's waffling with respect to the need for conducting research regarding the potential development of an aviation program.

The court notes that none of these individual factors were delineated in Hill's April 12, 2022, email to Pfang in which she issued a verbal warning to Pfang with respect to the aviation program.  In it, Hill states, "Moving forward, it is imperative that you follow the chain of command and keep me well informed of potential external opportunities and meetings prior to confirming LIT's participation."  As outlined above, the evidence indicates that Pfang kept both Hill and Howard informed of his dealings with respect to the aviation program meetings, which they approved, further suggesting that the reasons advanced by LIT were a pretext for unlawful discrimination.   The court also questions how these issues with respect to the aviation program supported Pfang's ultimate termination.  Hill concludes the email by stating, "As discussed, this was a misstep that can be corrected as we continue to work together in moving LIT and our new programs forward.  Your leadership and expertise is needed in developing our new programs and program review plans."  This was nine days before Pfang was terminated.

b.    Failure to Inform Hill of the Vehicular Accident

LIT's final proffered reason for Pfang's termination is that he failed to inform Hill of a vehicle accident involving one of LIT's driving instructors in a timely manner, as referenced above.  The summary judgment evidence surrounding this incident is rife with factual disputes. The record reflects that Pfang received an email on March 17, 2022, from his assistant, Kathleen

44

Hawsey ("Hawsey"), about the accident involving Larry Helms ("Helms"). Pfang responded to the email and asked Hawsey to share the information with Appu Bishell, who was in charge of insurance, and was supervised by Gonzales. On March 31, 2022, Pfang and Gonzales were copied on an email that Knape sent to Hill and Marc Jones ("Jones")[12] asking, "has an LIT truck driving instructor been involved in a moving accident involving a company vehicle, prior to Larry Helms?" Hill responded to the email the same day stating, "I am not aware of any moving accidents but will defer to the workforce department for certainty." Hill instructed Pfang in the same email to have Hawsey and Pfang's team investigate the inquiry. There is no indication from this email that Hill was surprised by this information regarding Helms. According to Pfang, there was also no mention of the accident until he alleged he was being discriminated against in his April 13, 2022, email response to Hill's issuance of a verbal warning regarding the aviation program.

The competent summary judgment evidence demonstrates that on April 12, 2022, at 3:43 p.m., Pfang forwarded Hill an email from Jones regarding two issues, one of them concerning an upcoming court date for Helms regarding the accident. This suggests that Pfang was working to ensure that Hill was kept abreast of what was transpiring with respect to Helms. Pfang then sent his April 13, 2022, email response to Hill at 9:48 a.m., wherein he put both Hill and Knape on notice of his allegations of discrimination regarding the verbal warning. Pfang stated:

> As an Asian immigrant you have disciplined me today with an unjust and inappropriate verbal warning. In contrast, Dr. Prince, who is an African American non-immigrant, has not been disciplined in spite of:

---

[12] Jones was the head of the truck driving school and reported to Pfang.

45

    1.      Unprofessional and crude behavior;

    2.      Not following the established administrative channels, going straight to Dr. Howard and yourself with complaints;

    3.      Reluctantly and unsatisfactorily completing assigned duties;

    4.      Publicly insulting his superior's management style and accusing him of unjustified misdemeanors;

    5.      Dr. Prince has not been given a verbal warning by you, instead a conversation "closed this matter";

    6.      Dr.  Prince's behavior has not been examined in front of five of his colleagues as I have been.

I hope we can resolve this grievance in an equitable and fair manner with the unjust warning being retracted and a written apology.

Otherwise, in view of you and Dr. Howard being of the same race as Dr. Prince, I request this matter be referred to the Chancellor's Office to be investigated fairly, without racial prejudice.

The record then reflects that on the same day at 3:13 p.m., Hill began questioning Pfang about the Helms incident and whether he had reported it to her.  In the exchange, Hill alleged that she did not recall being made aware of the accident until the April 12, 2022, email forwarded from Jones.  Despite Pfang's documenting whom he informed and telling Hill he would be sure to inform her in the future, an investigation then ensued which ultimately culminated in Pfang's termination.  The April 21, 2022, investigation notes drafted by Tina Johnson, Manager of Instruction, reflect confusion on the LIT policy regarding reporting accidents and other examples of non-reporting failures by the LIT executive team, yet Pfang was the only one terminated.  To confound matters further, Hill admitted in her deposition that there was no formal written policy regarding such reports, yet Pfang was terminated.  In sum, there is sufficient evidence that a jury could conclude that LIT's articulated reason for terminating Pfang is pretextual.  In addition, Hill now, and during her deposition, unfathomably claims that Pfang's April 13, 2022, email did not

put her on notice that he claimed he was being discriminated against.[13]  While LIT argues that Pfang cannot meet the "but for" causation standard required in the pretext analysis for his retaliation claim, the court disagrees—there is a substantial fact question surrounding this issue.[14]

As outlined above, and contrary to LIT's repeated assertions, Pfang does not rely solely on his subjective belief that the five stated reasons for his termination were pretextual.  There is more than substantial evidence that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.  Pfang has adduced sufficient evidence to create a genuine dispute of material fact that LIT's explanations are false or unworthy of credence, and taken together with the plaintiff's *prima facie* case, support an inference of discrimination.  All of this evidence rebuts the "same-actor rule" advanced by LIT, wherein it alleges that because Howard hired Pfang and approved the recommendation for his termination, LIT is entitled to the "inference that . . . discrimination was not the motive behind [the] termination."  *Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 421-22 (5th Cir. 2009) ("Spears correctly argues that the presumption created by the same actor inference is not irrebuttable.").  Thus, summary judgment is not warranted as to Pfang's claims of disparate treatment and retaliation.

---

[13] This conflicts with Knape's declaration, who testified that she investigated the incident, which included interviewing Hill.  Nonetheless, Hill testified in her deposition that she did not know of an investigation and stated she was never interviewed.

[14] Contrary to LIT's assertions, Pfang does not rely on temporal proximity alone in the pretext phase.  "The combination of suspicious timing with other significant evidence of pretext can be sufficient to survive summary judgment."  *Garcia*, 938 F.3d at 244 (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999)).

4.    <u>Hostile Work Environment</u>

LIT argues that Pfang cannot establish a *prima facie* case of hostile work environment. In response, Pfang avers that LIT fails to challenge the evidence put forth in support of this claim. Pfang contends further that this claim requires consideration of "the totality of the circumstances" in order to determine whether the conduct is objectively offensive.  In its sur-reply, LIT maintains that the summary judgment evidence does not support a claim for hostile work environment, arguing that Pfang exaggerates the severity of the working environment "through his inflammatory language and unsupported allegations."

"A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)); *see also Noiel v. Roseland Mgmt., L.L.C.*, No. 24-40520, 2025 WL 1219196, at *3 (5th Cir. Apr. 28, 2025); *Hudson v. Lincare, Inc.*, 58 F.4th 222, 229 (5th Cir. 2023).

To establish a *prima facie* case of a racially hostile work environment based on the actions of a supervisor with immediate or successively higher authority over the employee, a plaintiff must show that:

(1)    he belongs to a protected class;

(2)    he was subject to unwelcome harassment;

(3)    the harassment was based on the protected class; and

(4)    the harassment affected a term, condition, or privilege of employment.

*See Spann v. FedEx Freight, Inc.*, No. 24-60318, 2025 WL 1938355, at *6 (5th Cir. July 15, 2025) (citing *Clark v. City of Alexandria*, 116 F.4th 472, 479 (5th Cir. 2022); *Johnson v. PRIDE Indus., Inc.,* 7 F.4th 392, 399-400 (5th Cir. 2021); *Hernandez*, 670 F.3d at 650; *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003); *Celestine v. Petroleos De Venezuella SA*, 266 F.3d 343, 353-54 (5th Cir. 2001); *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).  When a supervisory employee is involved, once the plaintiff satisfies these four elements, an "employer is subject to vicarious liability to a victimized employee."  *Watts*, 170 F.3d at 509 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)); *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764 (1998); *Ackel*, 339 F.3d at 383.[15]  With respect to allegations of racial harassment committed by a co-worker, the plaintiff must also satisfy a fifth element, "that the employer knew or should have known of the harassment in question and failed to take prompt remedial action."  *Spann*, 2025 WL 1938355, at *6; *Clark*, 116 F.4th at 479; *Watts*, 170 F.3d at 509 n.3 (citing *Williamson v. City of Houston*, 148 F.3d 462, 464 (5th Cir. 1998)); *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999).

---

[15] Although the Supreme Court's decisions in *Faragher* and *Ellerth* deal with claims of sexual harassment, their reasoning is equally applicable to claims of racial harassment.  *See Walker v. Thompson*, 214 F.3d 615, 626 n.13 (5th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 52 (2006); *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 411 (6th Cir. 1999); *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1269 (10th Cir. 1998).

"The court must look at 'all the circumstances,' including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *See Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993); *Nat'l R.R. Passenger Corp.*, 536 U.S. at 116; *E.E.O.C. v. Gen. Motors Corp.*, 299 F. App'x 367, 268 n.5 (5th Cir. Nov. 12, 2008) (citing *Faragher*, 524 U.S. at 787-88); *Hernandez*, 670 F.3d at 651; *Septimus v. Univ. of Hous.*, 399 F.3d 601, 611 (5th Cir. 2005); *Rodriguez v. Cooper Cameron Valves TBV Techno, Inc.*, No. H-12-0764, 2014 WL 3044797, at *8 (S.D. Tex. July 3, 2014) (quoting *Harris*, 510 U.S. at 23).   To be actionable, the hostile environment must be both objectively and subjectively offensive.   *Faragher*, 524 U.S. at 787 (citing *Harris*, 510 U.S. at 23); *Julian v. DeJoy*, No. 23-11101, 2024 WL 4433076, at *6 (5th Cir. Oct. 7, 2024) (citing *WC&M Enters.*, 496 F.3d at 399).   With regard to the conduct of co-workers, the employer may avoid liability if it took "prompt remedial action" to protect the claimant.   *Williams-Boldware v. Denton County*, 741 F.3d 635, 640 (5th Cir. 2014) (citing *Hockman v. Westward Comm.* LLC, 407 F.3d 317, 326 (5th Cir. 2004)).   What constitutes prompt remedial action is a fact-specific inquiry and "not every response by an employer will be sufficient" to absolve the employer of liability. *Williams-Boldware*, 741 F.3d at 640 (citing *Hockman*, 407 F.3d at 329).

"Hostile work environment" harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment."   *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (quoting 29 C.F.R. § 1604.11(a)); *Mattern v. Eastman Kodak Co.*, 104 F.3d 702,

706 (5th Cir. 1997).  To survive summary judgment on a hostile work environment claim based

on race, the nonmovant must create a fact issue as to each of the following elements:  "(1) racially

discriminatory intimidation, ridicule and insults that are; (2) sufficiently severe or pervasive that

they; (3) alter the conditions of employment; and (4) create an abusive working environment."

*Walker*, 214 F.3d at 625 (citing *DeAngelis v. El Paso Mun. Police Officers Ass'n.*, 51 F.3d 591,

594 (5th Cir. 1995) (citing *Harris*, 510 U.S. at 20)); *accord Harvill v. Westward Commc'ns,

L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005).  Whether a work environment meets these criteria

depends upon the totality of the circumstances.  *See Harris*, 510 U.S. at 23; *E.E.O.C. v. Boh

Bros. Constr. Co., L.L.C.*, 731 F.3d 444, 453 (5th Cir. 2013); *Harvill*, 433 F.3d at 434;

*Hockman*, 407 F.3d at 325; *Septimus*, 399 F.3d at 611; *Walker*, 214 F.3d at 625;.

Conduct in the workplace that could be labeled as "harassment" will not fall within the

purview of Title VII, however, if (1) it fails to affect a term, condition, or privilege of

employment or (2) it is not based on a prohibited discriminatory animus.  *See Trujillo v. Univ. of

Colo. Health Sci. Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998) (quoting *Bolden v. PRC, Inc.*, 43

F.3d 545, 551 (10th Cir. 1995) (citing *Vinson*, 477 U.S. at 67)); *see also Hernandez*, 670 F.3d

at 654, 659.  "Title VII does not prohibit all verbal or physical harassment in the workplace; it

is directed only at '*discriminat[ion]* . . . because of . . . [plaintiff's protected status].'"  *Oncale

v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998) (emphasis in original) (quoting 42

U.S.C. § 2000e-2(a)(1)); *see Hernandez*, 670 F.3d at 651; *Brown v. Henderson*, 257 F.3d 246,

252 (2d Cir. 2001).  "The complained of conduct must have . . . a racial character or purpose to support a Title VII claim" based on race.  *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1990); *see also Washington v. M. Hanna Constr. Inc.*, 299 F. App'x 399, 401 (5th Cir. 2008) (recognizing that plaintiff's reporting of employer's safety violations to OSHA was not protected activity under Title VII).

Moreover, to establish a viable hostile work environment claim, the plaintiff must present "more than a few isolated incidents of racial enmity."  *Hockman*, 407 F.3d at 326 (citing *Shepherd*, 168 F.3d 874); *Fortenberry v. Texas*, 75 F. App'x 924, 928 (5th Cir. 2003); *Jones v. Barnhart*, 349 F.3d 1260, 1268 (10th Cir. 2003) (quoting *Bolden*, 43 F.3d at 551 (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1417-18 (10th Cir. 1987)); *see Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005); *Trujillo*, 157 F.3d at 1214.  "Title VII 'was only meant to bar conduct that is so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the workplace,' and therefore conduct that only 'sporadically wounds or offends but does not hinder' an employee's performance is not actionable."  *Skinner v. Brown*, 951 F. Supp. 1307, 1322 (S.D. Tex. 1996), *aff'd*, 134 F.3d 368 (5th Cir. 1997) (quoting *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996)); *see also Hockman*, 407 F.3d at 326; *Alzuraqi v. Grp. 1 Automotive, Inc.*, No. 3:12-CV-223-L, 2013 WL 395536, at *6 (N.D. Tex. Feb. 1, 2013); *E.E.O.C. v. Rock-Tenn Servs. Co., Inc.*, 901 F. Supp. 2d 810, 824 (N.D. Tex. Aug. 22, 2012) (refusing, pursuant to the continuing violation doctrine, to consider an isolated event of verbal abuse to be part of a timely hostile work environment claim).  "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory

changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (quoting *Oncale*, 523 U.S. at 82) (citations omitted); *see Hockman*, 407 F.3d at 328; *Shepherd*, 168 F.3d at 874.  The "'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not sufficiently alter terms and conditions of employment to violate Title VII." *Faragher*, 524 U.S. at 787 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971)); *see Hockman*, 407 F.3d at 328; *Shepherd*, 168 F.3d at 874; *Boyd v. State Farm Ins. Co.*, 158 F.3d 326, 329 (5th Cir. 1999) (citing *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1295 (5th Cir. 1994)).  "[E]vidence of 'routinely [made] racist remarks,'" however, may be sufficient to raise a fact issue to prevent summary judgment.  *Walker*, 214 F.3d at 626 (quoting *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1049 (5th Cir. 1996)).

In this case, Pfang argues that the racial component of the harassment is supported in the summary judgment record, along with his allegations of race-based discrimination, as discussed at length with respect to his claim of disparate treatment.  Pfang alleges that Howard, Hill, both supervisors, and Prince, a subordinate, created the hostile work environment.  In analyzing his claim of hostile work environment, the uncontested summary judgment evidence reflects that Hill refused to allow Pfang to issue a verbal warning to Prince, his subordinate.  Instead, Hill sent an email to Prince on March 22, 2022, copying Pfang, telling him to work with Pfang and advising Prince that she will have the same conversation with Pfang, appearing to treat them as equals.  This was followed by a meeting between Pfang, Howard, Hill, Gonzales, and Prince, wherein

Pfang alleges he was "called on the carpet to answer baseless charges."[16]  Pfang states in his declaration that during this meeting, Howard read out the charges Prince made against Pfang without giving Pfang any prior notice that the complaints were made or their specifics.[17]  The second meeting referenced by Pfang occurred on March 31, 2022, the day after Beaumont city officials toured the LIT campus.[18]  Pfang states that Howard convened a meeting wherein "he went around and asked everyone if the proposal for the aviation program had been mishandled."  Pfang states he was the only one who did not concur with this conclusion.  This meeting was then followed by the April 12, 2022, email from Hill wherein she issued Pfang a verbal warning.  The final meeting was the "fact-finding" meeting relating to the Helms truck accident that was held on April 14, 2022.  This all occurred in less than a month.

In describing his claim of a hostile work environment, Pfang states:

> I wrestled with how this could be happening.  I did not want to believe it was racial discrimination or bias against me.  In my experience, when an accusation is made against a team member, the person receiving the accusation first asks the person being accused for their point of view.  The accused is not confronted with anonymous accusations in front of their peers, their accuser, and subordinates.  However, this happened to me over and over.  First, when Dr. Howard read from an email that Byron Prince sent him, that I had never seen, which Dr. Prince sent after I attempted to discipline him.  He came up with a list of accusations against

---

[16] Prince actually requested the meeting in front of Howard, Hill, and Gonzales.

[17] Some of Prince's complaints related to the aviation program and involved allegations that Pfang undermined Williams-Parker in her efforts to develop the program, the very program he was later criticized for moving forward.

[18] Pfang alleges that, at the conclusion of the LIT tour, Williams-Parker took the Beaumont city officials to Howard's office without Pfang's prior knowledge.  Once Pfang heard they were meeting with Howard, he went to the "impromptu" meeting but soon left once he realized he had been betrayed, presumably because he was not previously informed of the meeting.

> me, and Dr. Howard took his side by publicly interrogating me about them. Then, at the meeting where Dr. Howard asked everyone to raise their hand if they thought I had mishandled the proposal for aviation programs. Finally, Angela Hill's reaction in mid-April, regarding a minor traffic accident which she had been emailed about by Beth Knape in March, left me incredulous.
>
> The atmosphere at LIT became so toxic, and I was so miserable. I didn't know what to do. I felt that I couldn't even tell my wife. I was accused of not keeping people informed, when I could provide proof that I had kept them informed (in the case of the aviation proposal). An 'investigation' and 'fact-finding' was launched regarding who told whom about a vehicle accident, leading to my termination, despite my admitting up front that I had not directly informed the Provost. I was subjected to another week of demands for information, for a timeline of events—not to provide information on the accident itself, or possible ramifications for the school, but simply about who knew about it when, and to whom they reported it. At all times I was treated as less worthy of the benefit of the doubt than my subordinate, or of Rudy Gonzale[s], and I was humiliated.

Yet, in none of Pfang's claims does he tie the purported harassment to his race, national origin, or ethnicity. He does not allege, much less produce evidence, that Howard, Hill, Prince, or any of the executive team, ever made adverse remarks based on Pfang's being Asian or Chinese or called him derogatory names associated with his race, national origin, or ethnicity.

As previously stated, to survive summary judgment on a hostile work environment claim based on race, the nonmovant must create a fact issue as to each of the following elements: "(1) racially discriminatory intimidation, ridicule and insults that are; (2) sufficiently severe or pervasive that they; (3) alter the conditions of employment; and (4) create an abusive working environment." *Walker*, 214 F.3d at 625; *accord Harvill*, 433 F.3d at 434. The court finds that Pfang fails on both the first and second elements, namely, he has failed to show that the alleged hostile work environment was racially discriminatory or that it was sufficiently severe or pervasive under established Fifth Circuit precedent.

55

With respect to the first element, "Fifth Circuit precedent makes it clear that subjective belief of race- or sex-based motivation cannot import animus into an individual's conduct, and, without objective evidence, is insufficient to create a prima facie claim for a hostile work environment under Title VII." *Mills v. City of Shreveport*, No. CV 5:17-1088, 2019 WL 4463322, at *7 (W.D. La. Sept. 17, 2019); *see Price v. Valvoline, L.L.C.*, 88 F.4th 1062, 1067 (5th Cir. 2023) (holding that plaintiff did not present sufficient evidence that "facially neutral actions" were racially motivated to support his claim for hostile work environment); *Lyles v. Tex. Alcohol Beverage Comm'n*, 379 F. App'x 380, 384 (5th Cir. 2010) ("With no objective evidence in the record to substantiate Lyles's opinion that Perry's conduct was race-based, we conclude that the district court was correct to award summary judgment in favor of TABC on Lyles's hostile work environment claim."); *Montgomery v. Sears Roebuck & Co.*, 720 F. Supp. 2d 738, 745 (W.D. La. 2010) (collecting cases). Here, the record is devoid of any objective evidence to substantiate Pfang's opinion that the harassment he allegedly suffered was based on his race, national origin, or ethnicity.

Additionally, for harassment to be actionable, it must be "sufficiently severe" or "pervasive" to alter the conditions of employment and create an abusive working environment. *Harvill*, 433 F.3d at 434. In *Walker*, the Fifth Circuit reversed a district court's grant of summary judgment where the plaintiffs had suffered years of inflammatory racial epithets, including being called "n-----s" and "little black monkeys," and were the frequent victims of "comparisons to slaves and monkeys," derisive remarks regarding their African heritage, [and] patently offensive remarks regarding the hair of African-Americans[.]" 214 F.3d at 626 (quoting *Wallace*, 80 F.3d

at 1049 n.9). In more recent decisions, the Fifth Circuit found potentially actionable harassment based on somewhat less "extreme" conduct. *See Jordan v. Downtown Dev. Dist.*, No. 2:21-CV-01323, 2024 WL 1179082, at * 4 (E.D. La. Mar. 19, 2024) (citing *E.E.O.C. v. WC&M Enterp., Inc.*, 496 F.3d 393, 400 (5th Cir. 2007) (holding that a reasonable jury could conclude the harassment at issue was severe or pervasive where a plaintiff, an Indian Muslim, was regularly called "Taliban" and "Arab" by coworkers, who also told him to "just go back where [he] came from" and insinuated that he had been involved in the September 11, 2001, terrorist attack) and *Johnson*, 7 F.4th at 400-04 (recognizing a genuine issue of material fact existed as to severity or pervasiveness where a superior coworker frequently called the African American plaintiff "mijo" or "manos"—relating the use of these diminutives to the racist history of calling African American men "boy"—twice used the Spanish-language equivalent of "n*****" to refer to him in conversation with others, and regularly used racially offensive language in general).

The Fifth Circuit has affirmed summary judgment, however, in some cases that involve clearly derogatory comments and actions on the grounds that they were insufficiently severe or pervasive to be actionable. *See West v. City of Houston*, 960 F.3d 736, 742-43 (5th Cir. 2020) (holding complaints of coworkers passing gas at the dinner table, infrequently sleeping in their underwear at the station, making the occasional racially insensitive joke, and bringing adult magazines to the station were insufficient to survive summary judgment on hostile work environment claim based on sex and race); *Gibson v. Verizon Serv. Org., Inc.*, 498 F. App'x 391, 394-95 (5th Cir. 2012) (finding that a single race-based comment was legally insufficient to rise to the level of "severe and pervasive," as is required to make a prima facie case of hostile work

environment); *Jordan*, 2024 WL 1179082, at \*5 (citing *Cavalier v. Clearlake Rehab. Hosp., Inc.*, 306 F. App'x 104, 105-06 (5th Cir. 2009) (per curiam) (holding that African American plaintiff's claims that he was repeatedly called "boy" by a supervisor, who also threatened to "beat the tar off of him" were not actionable); *Johnson v. TCB Const. Co.*, 334 F. App'x 666, 670 (5th Cir. 2009) (per curiam) (holding that African American plaintiff's claims that his supervisor called him a "damn n-----" on one occasion and regularly used that derogatory epithet in general workplace conversations were insufficient to support a hostile work environment claim).  No conduct approaching these levels of harassment occurred here.  Under these circumstances, the court concludes that there is insufficient evidence to raise a genuine dispute of material fact as to whether the alleged harassment in this case was based on Pfang's race, national origin, or ethnicity or was sufficiently severe or pervasive as to give rise to an actionable hostile work environment claim under Title VII.  Based on the evidence in the record and controlling Fifth Circuit precedent, LIT is entitled to summary judgment on Pfang's claim of hostile work environment.

III.    Conclusion

Accordingly, LIT's Amended Motion for Summary Judgment (#53) is DENIED as to Pfang's claims of disparate treatment and retaliation.  There exist genuine disputes of material fact with respect to these two claims and Pfang, therefore, may proceed to trial on his claims of disparate treatment and retaliation.  LIT's Amended Motion for Summary Judgment (#53) is GRANTED as to Pfang's claim of hostile work environment.  There remain no material facts in dispute as to Pfang's claim of hostile work environment, and LIT is entitled to judgment as a

matter of law as to this claim.  LIT's Motion for Summary Judgment (#39) is DISMISSED as

MOOT.

SIGNED at Beaumont, Texas, this 24th day of September, 2025.


_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE